# THE STATE v. BARRINGTON, Appellant.

## In Banc, June 20, 1906.

1. **INDICTMENT:** Indorsement of Names of Witnesses. The names of all the witnesses who appeared before the grand jury were indorsed on the indictment, and the prosecuting attorney testified that at the time the indictment was returned he knew nothing about the evidence of the one witness against whom the principal cómplaint is directed. The motion to quash was made in October, and the trial was more than four months later. *Held*, that the motion to quash on the ground that the name of the one material witness was not indorsed on the indictment, was properly overruled, and no error was committed in permitting the State to use that witness.

   *Held*, by **Valliant, J.**, dissenting, that the statute means that the State shall not purposely withhold the names of witnesses and surprise the defendant with them on the trial. And as this case shows that 29 witnesses were used whose names were not on the indictment, and that 11 of them were used at the preliminary trial and 3 of them had testified before the coroner, good faith and fair dealing required the trial court, on request, to compel the State to produce the subpoenas that had been issued for witnesses to come before the grand jury.

2. **DEFENDANT:** Cross-Examination: Preserved for Review. An assignment in the motion for a new trial that "the court erred in admitting illegal, irrelevant, incompetent and immaterial testimony," will preserve for review error in the cross-examination of a defendant on trial, if the objections at the trial were sufficiently specific to notify the trial court of the nature and character of the objections and the reasons for them.

3. ——: ——: ——: General Objection: Sufficiency. A general objection to a question propounded to a defendant on cross-examination, that it is irrelevant, incompetent, immaterial, and not proper cross-examination, is sufficiently specific to apprise the court of the nature and character of the objection, and to preserve the point for review on appeal.

4. ——: ——: Non-Prejudicial Matters. Questions propounded to a defendant on trial for murder, as to where he had lived in the past, what had been his business, whether he had been married under another name in another city, etc., which he was by the court compelled to answer, were unimportant and

immaterial, but when it cannot be conceived how they and the answers, which were not contradicted, could have prejudiced his case, the judgment will not be reversed because of error in requiring them to be answered.

5. ———: ———: **Business: Other Crimes: Credibility.** The defendant was asked on cross-examination, "What has been your business in the last year or two?" To this question there was no proper objection, but defendant answered: "I was sent down January 31st, or the beginning of February, to the Work House for marrying Grace Wilhelmena Cochrane, the mayor exonerated me, and I went with a man named Gillespie to manage that saloon on Broadway. From there, I made arrangements with Mr. McCann [the deceased] to go to the Leland, and from the Leland I came to prison." *Held*, first, that the answer was not called for by the question and was in no way responsive to it, but was a voluntary statement, of which defendant has no right to complain; and, second, such inquiry, if he had been convicted of a misdemeanor and had been sent to the Work House, could properly have been made, under section 4680, R. S. 1899, providing that a former conviction of a criminal offense may be proved to affect the witness's credibility, either by the record or by his own cross-examination.

*Held*, by **Valliant, J.,** dissenting, that the statute does not mean that the past life of the defendant may be inquired into for the purpose of impeaching the credibility of the defendant. *Held*, also, that defendant having refused to answer questions of this character and having been compelled by the court to answer them, and the inquiries having reference to former crimes committed by him, the purpose of the inquiries could only have been to degrade him, and they were not in harmony with a fair trial. *Held*, also, that though some of them were not specifically objected to, so grave an error ought not to be overlooked on so small a technicality, when a man's life is at stake.

6. ———: ———: **When Error.** To work a reversal of a judgment on the ground of improper cross-examination of the defendant, such cross-examination must have had some reference to matters material in the cause, to which the defendant, in his direct examination, did not refer; or if immaterial, it must have been along a line and upon subjects which had a tendency to prejudice the jury against the defendant or his case.

7. **CHANGE OF VENUE: Prejudice of Inhabitants: When Allowed.** A change of venue in a criminal case on account of the prejudice of the inhabitants of the county, rests largely in the discretion of the trial judge, and his decision finding that no such prejudice exists and denying the application will not

be disturbed by the appellate court unless there is something in the circumstances indicating an abuse of that discretion. And where there were forty-one witnesses introduced by defendant in support of the application, and thirty-seven in resistance of it, and there is nothing to indicate any feeling or prejudice on the part of the trial judge against defendant, and he refused to limit the number of witnesses to be introduced, and resided in the county, and nothing else can be found in the record indicating an abuse of his discretion, the appellate court will not interfere.

*Held*, by **Valliant, J.,** dissenting, that the opinions of no number of witnesses could make it appear, in the face of the tremendous amount of inflammatory matter damaging to the worst degree, published in all the newspapers for days upon days while defendant was awaiting his trial, and circulated among the people of the county, that prejudice in the minds of the people against him did not exist, and the court should have taken those positive facts and granted the application and a denial of it was a denial of a fair trial to defendant.

8. ——: ——: ——: **Newspaper Article: Theatrical Exhibitions.** The fact that the county adjoined a great city, in whose papers appeared inflammatory articles denouncing the defendant, and the fact that there was a theatrical performance in that city in which defendant was impersonated by one of the characters, cannot be said to have made out a conclusive case of prejudice in the minds of the inhabitants of the county.

*Held*, by **Valliant, J.,** dissenting, that as a large number of respectable people testified that there was a prejudice in the minds of the people of the county against defendant; that the strongest evidence of that prejudice was the newspapers which circulated in the county; that every strong newspaper in the city published, day after day, columns of the most damaging statements concerning him; that these professed to have discovered and brought to light events in his past life connecting him with the most atrocious crimes in Europe before he came to America, and the despoiling of at least two young women under fictitious marriages in this country; that they took up what was said to be the evidence in this cause, and showed the defendant in the light of a cruel murderer of his best friend; that these inflammatory utterances had stirred the public mind to such a height that the managers of one of the prominent theaters in the city, only eight miles from the court house where defendant was tried, caused a most thrilling melodrama called "The Desperate Lord Barrington" to be prepared and put upon the stage, in which defendant was the chief villain and deceased his latest vic-

tim, and this play ran for night after night preceding his trial—the evidence of the prejudice of the inhabitants of the county was overwhelming, and the application for a change of venue should have been sustained.

9. **ORDERING VENIRE: Presence of Defendant.** The order of a *venire* from which a qualified panel is to be chosen, does not constitute such a substantive step in the prosecution as makes it a part of the trial and makes the presence of defendant essential, within the meaning of the statute which requires the presence of the defendant "during the trial."

10. ———: ———: **Presumed to be Present.** If the order for a *venire* is to be considered a part of the trial, then the arraignment and plea of not guilty must also be considered a part of it; and if the record discloses that defendant was present when he was arraigned and the plea of not guilty was entered, it will be presumed, in the absence of evidence to the contrary, that he was present when the order for the *venire* was made.

11. **REMARKS OF COUNSEL: Abuse of Defendant: Non-Prejudicial.** The assistant counsel for the State used these words in addressing the jury: "In all candor and with due reverence, I wish to confess to you that during the progress of this trial, my conception of the devil has been materially changed. And if I were to portray him to you now, I would not paint him as hoofed and horned, lurid with purgatorial fires, but rather would I picture him to you as arrayed in white vest and Prince Albert coat, with a voice as soft as the breath of summer, and with a steel gray eye." At the same time, he pointed to defendant, who was dressed in a white vest and a Prince Albert coat. The court immediately, calling the attorney by name, said: "That is not proper argument." *Held*, that these remarks were improper, but were not of that low order of abuse and denunciation of a defendant recognized as prejudicial error, and as the court, in the presence of the jury, promptly rebuked the attorney, the judgment will not be reversed.

*Held*, by **Valliant, J.**, dissenting, that these remarks of consel were vindictive, passionate, pitiless and cruel denunciation of a prisoner, and that this court cannot tell whether or not the court's rebuke cured the wrong done, and the verdict should have been set aside.

12. ———: ———. **Reptilian Sagacity.** A statement by the State's attorney that the defendant, in explaining the damaging circumstances shown against him, showed "reptilian sagacity," was nothing more than saying he was "as wise as a serpent," and being promptly rebuked by the court, was not reversible error.

13. **MISCONDUCT OF JUROR: Necessary Showing.** When a defendant moves for a new trial on the ground of misconduct of

a juror which occurred during the trial, he must show affirmatively that both he and his counsel were ignorant of the misconduct until after the trial. And where the affidavits charge that a juror, during a recess in the trial, leaned out of the window and talked to some man on the sidewalk, but failed to disclose at what time the knowledge of such misconduct came to defendant or his counsel, that failure is fatal to the assignment.

14. ABATEMENT: Failure to Indorse Names of Witnesses. An allegation in a plea in abatement that the prosecuting attorney intentionally refrained from indorsing the names of material witnesses on the indictment for the purpose of springing them at the trial as a surprise on the defendant, is not a sufficient ground for abating the indictment or for submitting the plea to a jury; for, the court, if it found the fact to exist, could require the prosecuting attorney to indorse the names on the indictment and give the defendant a reasonable time in which to prepare for his trial; and the charge, even if found to be true, would not authorize the court to abate the indictment, for the statute, primarily, imposes the duty of indorsing the names of witnesses on the indictment upon the grand jury, and not upon the prosecuting attorney.

15. MURDER: Robbery: Abandonment: Instruction. The indictment contained five counts: the first charged murder by shooting; the second, murder by drowning; the third, murder by shooting and drowning; the fourth, murder by unknown means; and the fifth, murder in the perpetration of a robbery. *Held*, that a *nolle* of the fifth count, entered before the jury was sworn, was not such an abandonment of that feature of the case as made it error for the court to give an instruction authorizing a conviction if the jury found defendant killed deceased while in the perpetration of a robbery. It was proper to prove murder by robbery under the first three counts, and after the *nolle* of the fifth the case stood as if no such count had ever appeared in the indictment.

16. ——: Matters of Defense: Enemies of Deceased: Threats. Testimony that deceased had many enemies because of an illicit and fraudulent matrimonial agency he had conducted, and because he had engaged in a fraudulent turf business and get-rich-quick frauds, some of whom wrote him letters threatening personal violence, and that because of such frauds deceased had often changed his name, when offered by defendant, should be excluded, as tending to prove or disprove no issue involved in the murder trial.

17. COPY OF LETTERS. After sufficient showing of the loss or destruction of a letter itself competent, a copy, made before

State v. Barrington.

its loss and fully identified as being an exact copy, is competent as secondary evidence.

18. **PROVOCATION: Definition.** The words "without just cause or provocation" used in one instruction were sufficiently defined by another instruction which, in defining deliberation, said that "any such provocation by improper conduct of the deceased towards the defendant of such a nature as to cause the defendant to be so far under the dominion of sudden passion in consequence thereof, as to be unable to judge rightly as to the nature, quality and consequence of his acts, or to materially impede or interfere with such judgment, would take away deliberation and prevent a cool state of blood."

19. **IMPROPER CONDUCT: Definition** It is not necessary to define the words "improper conduct" used in the instruction on deliberation, in which it is said, "Any provocation by improper conduct of the deceased towards the defendant," etc.

20. **MURDER: Motive.** Defendant may be convicted of murder whether or not any motive for the deed is made apparent. But failure to show motive is a circumstance in favor of his innocence.

21. ———: **Instructions for Second Degree: Heat of Passion: Maximum Punishment.** Where defendant was either clearly guilty of murder in the first degree or of no offense at all, no instruction on the subject of murder in the second degree should be given, and in such case, if the court nevertheless gives such instructions, they are not error because they do not fix the maximum punishment, or because they do not define the different kinds of murder in the second degree other than murder in the heat of passion.

22. ———: **Instruction: Drowning With Design to Effect Death.** Where the instruction states that if the defendant "feloniously, willfully, deliberately and of his malice aforethought forcibly and violently" pushed deceased into a pond whereby he was drowned, it is not necessary that the instruction also state that the pushing was done "with a design to effect death." Nor is it necessary that those words be used in the indictment. In the absence of any testimony that defendant did not design to effect deceased's death, the jury are justified in indulging the legal presumption from the commission of the act that he intended to kill deceased by the means employed.

23. ———: **Refused Instructions: Covered by Others.** Where the instructions given fairly, clearly and fully covered the law on the subject of reasonable doubt and circumstantial evidence, it was not error to refuse others on the same subject asked by defendant.

State v. Barrington.

24. ————: **Indictment: Assault.** The first count of the indictment, set out in the statement, sufficiently charges the assault.

25. ————: ————: **With Design to Effect Death.** The second count of the indictment is not insufficient for that it fails to say that the pushing of defendant into a pond was done "with a design to effect death," the design and intention being clearly embraced in the charges stated.

26. ————: ————: **Gun-Shot Wound.** The third count of the indictment was not vague, indefinite and uncertain for that the words "gun-shot wounds" are used in reference to wounds previously charged to have been made with a "revolving pistol." In common usage the words "pistol" and "gun" are used interchangeably.

27. ————: **Verbal Statements of Defendant: "Sweating": Instructions: Solemn and Verbal Admissions: Caution.** The mere fact that the defendant was in charge of an officer does not render statements made by him inadmissible in evidence, if they were not induced by threats or promises of reward or the hope thereof; nor does the fact that they were elicited by questions put to him by an officer or private person, nor that the questions assumed his guilt, nor does the fact that he was not warned that his statements would be used against him.

*Held*, by **Valliant. J.,** dissenting, that statements obtained from "a course of sweating" by the police, continued from nine o'clock in the evening to two in the morning, when taken with this instruction, were error: "What defendant said against himself, if anything, the law presumes to be true because said against himself. What he said for himself you are not bound to believe because said in statements proved by the State, but you may believe it or disbelieve it as it is shown to be true or false by all the evidence in the case." Statements extorted from a defendant in that way should not be given to the jury with the legal presumption of absolute truth stamped upon them. *Held*, also, that the instruction itself is wrong: first, in invading the province of the jury who alone are entitled to determine the credibility of the witness; and, second, in failing to distinguish between solemn admissions and mere verbal admissions, which always are to be received with great caution.

28. ————: **Identifying Garment; Exhibiting Others.** It was not error to exhibit to the wife of deceased, who had identified the coat he had worn the night he was killed, a pair of trousers, as an aid in describing the material the coat deceased wore was made of—the trousers not being worn by him that night and not being offered in evidence.

29. ———: ———: **Belief.** A belief or opinion, resting upon facts within the witness's own knowledge, is a sufficient foundation for exhibiting to the jury articles and property of deceased, although the witness will not testify positively to their identity.

30. ———: **Searching Defendant: Credibility.** The credibility of witnesses who had testified to the examination and search of defendant, cannot be assailed or their testimony impeached by showing the custom of police officers in searching and examining prisoners.

31. ———: **Corpus Delicti: Circumstantial Evidence.** Both the death of the person alleged to have been murdered and the criminal agency of the defendant therein may be shown by circumstantial evidence, provided it is always sufficient to produce conviction in the minds of the jury beyond reasonable doubt. And in this case it is held that the testimony indicates most clearly that the dead body was that of deceased, and the circumstances connecting defendant with the killing of deceased point unerringly to his guilt.

32. ———: **Notoriety of Defendant.** Defendant has no reason to complain that the notoriety attained by defendant through the press created unfavorable surroundings for his case at the time of the trial in the county where the crime was committed, if that condition was created by himself.

Appeal from St. Louis County Circuit Court.—*Hon. Jno. W. McElhinney,* Judge.

AFFIRMED.

*Shelley Grover* and *Wilfred Jones* for appellant.

(1) The State failed to indorse upon the indictment the names of twenty-nine of its important witnesses, most of whom were known to it before the indictment was found. These witnesses were persons who swore to the strongest, and most fundamental and primary, of the facts involved in this case. R. S. 1899, sec. 2517; State v. Nettles, 153 Mo. 464; State v. Roy, 83 Mo. 268; State v. Cole, 145 Mo. 672; State v. Grady, 84 Mo. 220; State v. Steifel, 106 Mo. 129. (2) It was error for the court to permit the prosecuting attorney to cross-examine defendant on subjects foreign to his

direct-examination. R. S. 1899, secs. 2637, 2638; State v. Hathorn, 166 Mo. 239; State v. Palmer, 88 Mo. 568; State v. Evans, 168 Mo. 609; State v. Rugan, 5 Mo. App. 592; State v. Rugan, 68 Mo. 214; State v. Graves, 95 Mo. 510; State v. Hudspeth, 150 Mo. 31; State v. Brent, 100 Mo. 531; State v. Trott, 36 Mo. App. 29. Impeaching a defendant, who gives testimony in his own behalf, is confined to evidence of his general reputation and disproving material facts to which he swears. It is therefore reversible error to compel him to give testimony concerning his prior conduct, his confinement in jail or like questions that are not relevant or material to the issue being tried, unless he gives testimony in his direct examination on these irrelevant subjects. The same is true as to alias names. R. S. 1899, secs. 2637, 2638; State v. Hathorn, 166 Mo. 233, overruling Brooks-Maxwell case, 92 Mo. 542; State v. Evans, 158 Mo. 609; State v. Palmer, 88 Mo. 568; State v. Bernt, 100 Mo. 531; State v. Rugan, 5 Mo. App. 592, 68 Mo. 214; State v. Graves, 95 Mo. 510; State v. Hudspeth, 150˙Mo. 31.   (3)   As to the trial court's abuse of its discretion in overruling defendant's application for change of venue:   State v. Goddard, 146 Mo. 181; State v. Hudspeth, 150 Mo. 22; Rex v. Cowle, 2 Burrow 862; Rex v. Lewis, 1 Strange 704; Rex v. Clace, 4 Burrow 2458; Com. v. Bolph, 111 Pa. St. 382; State v. Wilson, 85 Mo. 139; State v. Turlington, 102 Mo. 653; State v. Burgess, 78 Mo. 236; State v. Hudspeth, 150 Mo. 23; State v. Tettaton, 159 Mo. 354; 2 Rap. Law Dict., 1070; Birdsong v. State 47 Ala. 68; Taylor v. State, 48 Ala. 180; Waddel v. Williams, 50 Mo. 216; Henry v. Bell, 75 Mo. 199; People v. Yoakum, 53 Cal. 566; State v. Elliot, 157 Mo. 609; State v. Prendible, 165 Mo. 329; State v. Huff, 161 Mo. 459; State v. Shepherd, 177 Mo. 229; Rapalje on Contempts, sec. 9; Merced M. Co. v. Fremont, 7 Cal. 130; Cabot v. Yarborough, 27 Ga. 478; Temple v. Supr. Ct., 70 Cal.

211; State v. Headrick, 149 Mo. 396; State v. Culver, 82 Mo. 623; State v. Foley, 144 Mo. 600.

*Herbert S. Hadley,* Attorney-General, and *John Kennish,* Assistant Attorney-General, for the State.

(1) If the State acting in good faith endorses on the indictment the names of such material witnesses as are then known, as was done in this case, it is not the practice, nor has this court so construed the statute, that upon the discovery of a material witness thereafter, notice of the fact must be given to the defendant. State v. Roy, 83 Mo. 268; State v. O'Day, 89 Mo. 559; State v. Steifel, 106 Mo. 129; State v. Nettles, 153 Mo. 464; State v. Tate, 156 Mo. 119; State v. Henderson, 186 Mo. 473. (2) Error was not committed on the cross-examination of defendant. 1. The point as to the improper cross-examination of defendant was not made a ground of the motion for a new trial, and therefore is not before this court for review. State v. Grant, 152 Mo. 72; State v. Westlake; 159 Mo. 678. And the general ground that the court admitted illegal, incompetent and irrelevant testimony, does not so preserve it. State v. Brown, 168 Mo. 474; State v. David, 159 Mo. 534; State v. Bartlett, 170 Mo. 672. 2. It will be noted that upon the cross-examination of defendant but five questions were asked to which objection was made, and an exception saved, and in no instance was objection made on the specific ground that the matter was not referred to in the defendant's examination in chief. The general objection was made that it was "irrelevant, incompetent and immaterial, and not proper cross-examination." 3. Where the defendant is asked questions of a general nature on his examination in chief, a wide range of cross-examination is allowed. State v. Avery, 113 Mo. 475; State v. Miller, 156 Mo. 86; State v. Cunningham, 154 Mo. 174; State v. McKenzie, 102 Mo. 632. 4. The cross-examination com-

plained of was as to unimportant and immaterial matters, and could not have prejudiced defendant. State v. Avery, 113 Mo. 499; State v. Brooks, 92 Mo. 582; State v. Beaucleigh, 92 Mo. 495; State v. Douglas, 91 Mo. 235. 5. Defendant's objection to the cross-examination was general and not specific and, therefore, insufficient. State v. Westlake, 159 Mo. 678; State v. Young, 153 Mo. 449; State v. Yandle, 166 Mo. 594; State v. Bartlett, 170 Mo. 672. 6. It is not improper to cross-examine the defendant as to a former conviction of a criminal offense, even where that subject was not referred to in his direct examination, and it was not error in this case to cross-examine defendant as to his conviction and imprisonment in the workhouse. Sec. 4680, R. S. 1899; State v. Blitz, 171 Mo. 530; State v. Thornhill, 174 Mo. 364. (3) The court did not err in overruling defendant's application for a change of venue. 1. The application was not supported by the affidavit of two credible, disinterested citizens of the county, as required by law. It is not stated in the affidavits nor elsewhere that the affiants are "credible." State v. Lanahan, 144 Mo. 31; State v. Headrick, 149 Mo. 396. 2. Defendant has no constitutional right to a change of venue. The right is purely a statutory right. State v. Lanahan, 144 Mo. 31; State v. Thompson, 141 Mo. 408; State v. Sanders, 106 Mo. 188; State ex rel. v. Wofford, 119 Mo. 408. 3. The decision of the trial court, upon the application for a change of venue, is final, unless an abuse of discretion is shown. State v. Wilson, 85 Mo. 139; State v. Whitton, 68 Mo. 91; State v. Northway, 164 Mo. 520; 1 Bish. New Crim. Proc. (4 Ed.), p. 72; 4 Ency. Pl. and Pr., 499. 4. An examination of the testimony offered in support of and against the application for a change of venue will show, not only that there was not an abuse of discretion by the trial court in the conclu-

sion arrived at, but that the court was fully warranted by the evidence in its decision. "To warrant the change it must appear that the prejudice is against the accused personally, and not against the offense with which he is charged. The prejudice must extend throughout the county generally, and it is insufficient that an impartial trial cannot be had by a jury from a portion thereof." 4 Ency. Pl. and Pr., 398, 401, 402; State v. Rhea, 25 Kan. 576; Dilger v. Com., 88 Ky. 550; State v. Goddard, 146 Mo. 177. (4) The assignment of error of improper conduct of the prosecuting attorney, in his references to the defendant in the argument, is one which has been many times before this court, and has been considered in the following cases, by the authority of which, on that point, it is contended that reversible, if error at all, was not committed in this case: State v. Summar, 143 Mo. 220; State v. Hyland, 144 Mo. 302 ; State v. Hibler, 149 Mo. 78; State v. Punshon, 133 Mo. 44; State v. Baber, 74 Mo. 292; State v. Emory, 79 Mo. 461.

FOX, J.—On Saturday, March 5, 1904, the appellant in this cause was convicted in the circuit court of St. Louis county of murder of the first degree. The indictment was filed October 2, 1903, and charged the defendant, in five separate counts, with the murder of James P. McCann at St. Louis county, on the 18th day of June, 1903. The names of forty-four witnesses were endorsed on the back of the indictment.

The defendant was arraigned on October 6, 1903, and filed a motion to quash the indictment, which motion the court, after hearing the evidence thereon, overruled.

November 7, 1903, the defendant filed a demurrer to the indictment, which, on the same day, was overruled.

On the last-named date the defendant filed a plea

in abatement, which was overruled by the court, except that the court found that the defendant was a citizen of Great Britain, and thereupon the defendant was formally arraigned and entered a plea of not guilty.

On December 24, 1903, the defendant filed an application for a citation for contempt against certain parties, and a second application for a similar citation on the 28th of December, 1903, on which last-named date, the court, after hearing evidence thereon, ordered that said application be denied.

January 7, 1904, the defendant filed his application for a change of venue, on the ground of the prejudice of the inhabitants of the county, which application, after hearing the evidence thereon, was overruled by the court, and the cause set for trial February 23, 1904.

On February 20, 1904, defendant filed his term bill of exceptions.

On the 23rd day of February, 1904, the defendant filed a motion to quash the special venire theretofore ordered for the alleged reason that the defendant was not present when the court made the order therefor. This motion being overruled, defendant filed his challenge to the array, alleging the same reason as contained in the motion to quash the *venire,* which challenge was also overruled.

Before the jury was sworn to try the case, the prosecuting attorney, over the objection of the defendant, entered a *nolle prosequi* as to the fifth count of the indictment.

The defendant then moved the court to compel the State to elect upon which of the four counts of the indictment it would go to trial, which motion was overruled by the court.

The indictment upon which this conviction is predicated being assailed, it is well to reproduce it here. The offense for the commission of which the defendant was convicted, was thus charged in the indictment:

"INDICTMENT.

"State of Missouri, County of St. Louis, ss:

"In the Circuit Court of St. Louis County. September Term, 1903.

"The Grand Jurors for the State of Missouri, now here in court, duly impaneled, sworn and charged to inquire within and for the body of the county of St. Louis and State of Missouri aforesaid, upon their oath present and charge that one Frederick Seymour Barrington on the 18th day of June, A. D. 1903, at the county of St. Louis and in the State of Missouri, in and upon one James P. McCann then and there being, feloniously, willfully, premeditatedly, deliberately, on purpose and of his malice aforethought did make an assault; and with a dangerous and deadly weapon, to-wit, a revolving pistol then and there leaded with gunpowder and leaden balls, which he the said Frederick Seymour Barrington in his hand then and there had and held, at and against him the said James P. McCann, then and there feloniously, willfully, deliberately, premeditatedly, on purpose and of his malice aforethought did shoot off and discharge and with the revolving pistol aforesaid and the leaden balls aforesaid then and there feloniously, willfully, premeditatedly, deliberately, on purpose and of his malice aforethought, did shoot, strike and penetrate and wound him the said James P. McCann in and about the vital part of the body of him the said James P. McCann, in the head and body of him the said James P. McCann, giving to him the said James P. McCann, at the county of St. Louis aforesaid and State of Missouri, on the said 18th day of June, 1903, with a dangerous and deadly weapon, to-wit, the revolving pistol aforesaid and the gunpowder and leaden balls aforesaid in and upon the head and body of him the said James P. McCann, divers and sundry mortal wounds, of which said mortal wounds he the said James P. McCann at the county of St. Louis and State of Mis-

souri aforesaid, on the said 18th day of June, A. D. 1903, then and there of the mortal wounds aforesaid instantly died. And so the grand jurors upon their oath aforesaid, do say that the said Frederick Seymour Barrington, him the said James P. McCann, in the manner and by the means aforesaid, feloniously, willfully, deliberately, on purpose and of his malice aforethought did kill and murder, against the peace and dignity of the State.

"And the grand jurors aforesaid, on their oath aforesaid, do further present and charge that the said Frederick Seymour Barrington on the 18th day of June, A. D. 1903, at the county of St. Louis in the State of Missouri, aforesaid, with force and arms and with great violence in and upon one James P. McCann then and there being, feloniously, willfully, premeditatedly, deliberately and of his malice aforethought did make an assault, and that him the said Frederick Seymour Barrington then and there feloniously, premeditatedly, deliberately, willfully and of his malice aforethought did take the said James P. McCann into both the hands and arms of him the said Frederick Seymour Barrington and did then and there feloniously, premeditatedly, deliberately, willfully and of his malice aforethought cast, throw and push the said James P. McCann into a certain pond there situate wherein the said pond there was a great quantity of water, by means of which said casting, throwing and pushing of the said James P. McCann into the pond aforesaid by the said Frederick Seymour Barrington in the manner and form as aforesaid, he, the said James P. McCann, in the pond aforesaid, with the water aforesaid, was then and there choked, suffocated, strangled and drowned, of which said choking, suffocation, strangling and drowning he, the said James P. McCann, then and there at the county of St. Louis, in the State of Missouri aforesaid, on the 18th day of June, A. D. 1903, instantly died. And so the grand jurors aforesaid, upon their oath aforesaid,

do say that the said Frederick Seymour Barrington, him the said James P. McCann, in the manner and by the means aforesaid feloniously, willfully, deliberately, premeditatedly and of his malice aforethought did kill and murder against the peace and dignity of the State.

"And the grand jurors aforesaid, on their oath aforesaid, do further present and charge that the said Frederick Seymour Barrington on the 18th day of June, A. D. 1903, at the county of St. Louis and State of Missouri, in and upon the said James P. McCann then and there being, feloniously, willfully, premeditatedly, deliberately, on purpose and of his malice aforethought did make an assault, and with a dangerous and deadly weapon, to-wit, a revolving pistol loaded then and there with gunpowder and leaden balls which he the said Frederick Seymour Barrington in his hands then and there had and held, at and against him the said James P. McCann, then and there feloniously, deliberately, willfully, premeditatedly, on purpose and of his malice aforethought did shoot off and discharge and with the revolving pistol aforesaid and the leaden balls aforesaid, then and there feloniously, willfully, premeditatedly, deliberately, on purpose and of his malice aforethought did shoot, strike and penetrate him the said James P. McCann, in and about a vital part of the body of him the said James P. McCann, in the head and body of him, the said James P. McCann, giving to him, the said James P. McCann, at the county of St. Louis aforesaid, and State of Missouri, on the 18th day of June, A. D. 1903, with a dangerous and deadly weapon, to-wit, the revolving pistol aforesaid and the gunpowder and leaden balls aforesaid, in and upon the head and body of him the said James P. McCann divers and sundry mortal wounds, and the said James P. McCann by reason of said mortal wounds so inflicted as aforesaid then and there became and was unconscious and insensible and in a stupor of body and mind and was then and there helpless and wholly in the power and

control of the said Frederick Seymour Barrington, and
that the said Frederick Seymour Barrington then and
there well knowing the helpless, unconscious and insen-
sible condition of the said James P. McCann and wick-
edly contriving and intending then and there the said
James P. McCann to kill and murder, he, the said Fred-
erick Seymour Barrington, on the said 18th day of
June, 1903, at the county of St. Louis and State of Mis-
souri aforesaid, then and there immediately after giv-
ing and inflicting the said gunshot wounds in the man-
ner and form aforesaid and at the time and place afore-
said in and upon the body of the said James P. McCann
did then and there with force and arms and with great
violence in and upon him the said James P. McCann
then and there being feloniously, willfully, premedita-
tedly, deliberately and of his malice aforethought did
make an assault and that him the said Frederick Sey-
mour Barrington then and there feloniously, premedi-
tatedly, deliberately, willfully and of his malice afore-
thought did take the said James P. McCann around the
neck and body of him the said James P. McCann into
both the hands and arms of him the said Frederick Sey-
mour Barrington and did then and there feloniously,
premeditatedly, deliberately, willfully and of his malice
aforethought cast, throw and push the said James P.
McCann into a certain pond there situate, wherein said
pond there was a great quantity of water, by means of
which said casting, throwing and pushing of the said
James P. McCann into the pond aforesaid by the said
Frederick Seymour Barrington in the manner and form
as aforesaid, he, the said James P. McCann, in the pond
aforesaid, was then and there choked, strangled and
suffocated, and by reason of the said choking, strang-
ling and suffocating with the water aforesaid, in the
manner and form aforesaid, as well as of the mortal
wounds inflicted upon him, the said James P. McCann,
by the said Frederick Seymour Barrington, in the man-
ner and form as aforesaid, he, the said James P. Mc-

Cann at the county of St. Louis and State of Missouri aforesaid, on the said 18th day of June, 1903, then and there of the mortal wounds aforesaid and the choking, strangling and suffocating aforesaid, then and there instantly died. And so the grand jurors aforesaid, upon their oath aforesaid, do say that the said Frederick Seymour Barrington, him, the said James P. McCann, in the manner and by the means aforesaid, feloniously, willfully, deliberately, premeditatedly and of his malice aforethought did kill and murder against the peace and dignity of the State.

"And the grand jurors aforesaid, on their oath aforesaid, do further present and charge that the said Frederick Seymour Barrington on the 18th day of June, A. D. 1903, at the county of St. Louis and State of Missouri aforesaid, in and upon the said James P. McCann feloniously, willfully, deliberately, premeditatedly, and of his malice aforethought did make an assault and the said James P. McCann in some way and manner and by some means, instruments and weapons to these jurors unknown did then and there feloniously, willfully, deliberately, premeditatedly and of his malice aforethought deprive of life so that the said James P. McCann then and there instantly died. And so the grand jurors aforesaid, upon their oath aforesaid, do say that the said Frederick Seymour Barrington, him, the said James P. McCann, in the manner and by the means aforesaid feloniously, willfully, deliberately, premeditatedly and of his malice aforethought did kill and murder against the peace and dignity of the State.

"And the grand jurors aforesaid, on their oath aforesaid, do further present and charge that the said Frederick Seymour Barrington on the 18th day of June, A. D. 1903, at the county of St. Louis, in the State of Missouri aforesaid, in the perpetration of a robbery from the person of one James P. McCann with force and arms did unlawfully, willfully, feloniously and of his malice aforethought make an assault in and upon

the said James P. McCann and that the said Frederick
Seymour Barrington in some way and manner and by
some means, devices, instruments and weapons to these
grand jurors unknown did then and there unlawfully,
feloniously, willfully, and of his malice aforethought
deprive the said James P. McCann of life so that the
said James P. McCann did then and there instantly die.
And so the grand jurors aforesaid, upon their oath
aforesaid, do say that the said Frederick Seymour Bar-
rington, him, the said James P. McCann, in the manner
and by the means aforesaid, in the perpetration of the
robbery aforesaid, unlawfully, feloniously, willfully,
and of his malice aforethought did kill and murder,
against the peace and dignity of the State.

"ROWLAND L. JOHNSTON,

"Prosecuting Attorney for the said County of St.
Louis, Mo."

As heretofore stated, on January 7, 1904, defend-
ant filed his application in due form praying for a
change of venue, on the ground of the prejudice of the
inhabitants of the county, and on a hearing on this ap-
plication on January 16th following, the same was by
the court overruled. The evidence introduced consist-
ed of testimony of witnesses and newspaper clippings.
The witnesses introduced by defendant were forty-five
in number and from different parts of the county.
Some of them testified to the existence of prejudice
against the defendant; that this prejudice consisted of
gossip and expressions of the people to the effect that
defendant was guilty of murdering McCann and ought
to be hung; that he was guilty without a doubt; that he
ought to be hung on general principles; that the prev-
alent opinion was that he was guilty; that he was a
rascal from the beginning; that ninety per cent of the
people thought him guilty two months after the alleged
crime was committed, but since then twenty per cent
has changed; that these expressions were based on
newspaper reports, and that the sentiment was gradu-

ally changing in favor of defendant; that the people seemed to be impressed with the enormity of the crime; that at the preliminary hearing when a ruling was made adverse to defendant there was applause. Other witnesses testified that the expression of opinion was about evenly divided; that for two or three months after the alleged crime the expressions were against the defendant but that it had naturally died out; that the people did not seem to have any interest in it and that there had been no expression of opinion one way or the other for two or three months; that some believed that McCann was still alive and would show up at the proper time and that it was a World's Fair scheme; that they had heard as much said in defendant's favor as against him; that he would never be convicted and could get as fair trial in the county as any where; that some people did not place much confidence in newspaper reports. Other witnesses testified that they had heard defendant commended for doing a public service in connection with his marriage to Miss Cochrane; that it was a good way of guarding other girls against titles and that they had heard sympathy expressed for defendant on account of his marriage with Miss Cochrane, while some more that the sentiment on that subject was about equally divided for and against him. That others take it for granted that what they see in newspapers is correct; others had heard no expressions one way or another. Counsel for defendant also offered and read in evidence copies of the St. Louis Globe Democrat, Republic, Post-Dispatch, World and Chronicle, containing sensational accounts of the killing, embellished with pictures of the defendant, the scene of the alleged crime, the burial of McCann, hat, pistol and watch and chain, property of McCann, found on defendant when arrested, declaring defendant guilty of McCann's murder; that he was an escaped convict from Newgate Prison, England, and as having escaped by means of his forging letters and documents for pardon; that he was a

many-times murderer, as having murdered a Lieuten-
ant Roby of the English army, and of having probably
robbed and murdered one John Moog in St. Louis; as
being a many-times bigamist, as being one Barton, *alias*
Burgoyne, a notorious English criminal; as being a
general "all-round" confidence man and "crook," and
as possibly being the notorious "Jack the Ripper."
These newspaper reports were published along every
few days, from the time defendant was arrested up to
a short time before the hearing on the application for
a change of venue.  Defendant also offered evidence
showing that a St. Louis theatre was advertising and
producing a play known and advertised as "The Des-
perate Lord Barrington," written of and concerning the
defendant while he was in jail awaiting trial on the
charge of killing McCann; that this play dealt with par-
ticulars, places and incidents in this cause, including
among others things Bonfils quarry and an impersona-
tion and representation of defendant in the St. Louis
county jail awaiting trial on this charge.

The State in rebuttal of this showing called as wit-
nesses county and city officers, government officers,
members of the bar of high standing in this court, news-
paper men, business men and farmers of long residence
in different portions of the county, to the number of
thirty-seven, whose testimony tended to show that no
such prejudice existed in the county as would prevent
defendant securing a fair and impartial trial.  These
witnesses testified that, while the case was discussed
considerably at first and some of the people in certain
portions of the county thought defendant guilty, others
had expressed themselves favorably toward defendant
and that there had been no discussion of the matter for
months; that it had ceased to be a matter of interest;
that the expressions of opinion on this matter in other
localities were about evenly divided; that the identity
of McCann's body was questioned and that there were
expressions that a case could not be made against de-

fendant; that McCann would turn up at the proper time, and that it was a fake, and a scheme gotten up by defendant's attorneys to make money. That in several of the most thickly settled portions of the county the majority of the people seemed to be favorable to defendant; that they had heard expressions of sympathy for defendant on account of his trouble with his wife and being placed in jail and that the punishment imposed was too severe; that the case had been spoken of in a jocular way. That in some localities they had heard expressions that if it was as printed in the newspapers defendant ought to be hung; the most of these expressions were made by non-residents of the county; that there had been no discussion of the case since the finding of the body, and that neither defendant nor McCann was known in the county prior to the alleged offense. That in one locality the prevailing opinion immediately after the alleged crime was committed, was that defendant was not guilty, and that this opinion had continued up to the time of the hearing of this application; and that at Clayton, the county seat, where defendant was in jail awaiting trial, the majority of the people seemed to be favorable to him.

At the close of the evidence upon the application, it was submitted to the court, and by the court overruled.

To the indictment defendant entered a plea of not guilty. The testimony introduced upon the trial of this cause, as preserved in the record, presents a volume of about three thousand pages; hence we shall not undertake in this opinion to reproduce in detail the testimony of all the witnesses as disclosed by the record; such a course can serve no good purpose, and it is sufficient to say that we have carefully considered all of the testimony introduced by both the State and the defendant, which is preserved in the record, and shall only undertake to state the main and important facts in this cause which the testimony tends to prove.

The evidence on behalf of the State was circumstantial and tended to show that James P. McCann, deceased, was a native of Kentucky; he was a large, well-built man about forty-five years of age. He owned race horses and bet on the races; he seemed to be well supplied with money and was very generous with it among his friends. He had been married in Kentucky and divorced, and on the 14th day of July, 1900, was married to a second wife, with whom he was living at the time of his decease. After his second marriage McCann and his wife lived in Chicago and thereafter moved to the city of St. Louis. In the latter place, Mrs. McCann, on her own account, engaged in the business of conducting a matrimonial agency (as she had formerly done in Chicago) and for that purpose maintained an office in the business part of the city. In the spring of 1903, McCann rented the property at 2901 Franklin avenue, in the city of St. Louis, intending to run it as a hotel during the World's Fair. They moved to this place about the 12th day of May, 1903, and called it the "Leland Hotel." At this place, two negroes, Charles and Oney Morrison, husband and wife, were employed as servants. The defendant came to the hotel a few days after the McCanns moved there, and a young man named Tom Leonard, who was acquainted with McCann, came there to board about a week before McCann disappeared. These persons were the only occupants of the Leland Hotel, when McCann, on the evening of the 18th day of June, 1903, in company with the defendant, left the hotel to be gone only a few minutes, but never returned.

The defendant represented himself to be an Englishman and was known as "Lord Barrington." McCann and Barrington met for the first time in April, 1903. Shortly before this meeting the defendant had received a good deal of newspaper notoriety by reason of his marriage to a young lady from Kansas City, and a prosecution in the city of St. Louis, resulting in

defendant's incarceration in the city workhouse. Af-
ter defendant's release from the workhouse, he was em-
ployed at a saloon, or cafe, on Broadway and Chestnut
streets in the city of St. Louis, which was then called the
"Lord Barrington Saloon." McCann met the defend-
ant at this saloon, expressed his sympathy for him and
gave the defendant fifty dollars as a present. The fol-
lowing day McCann introduced his wife to the defend-
ant at the corner of this saloon. Shortly after this,
defendant told McCann of his needy circumstances and
asked if he could stay at McCann's house, and ex-
pressed his willingness to do anything he could to pay
for his board. McCann then loaned defendant $50,
and defendant went to the Leland hotel to live. De-
fendant helped around the hotel, went out and around
with McCann frequently, collected money on races for
McCann, and had been at the hotel about a month when
McCann was last seen alive.

Wellston is a town or street car station situated
at the northwest boundary of the city of St. Louis.
The St. Louis, St. Charles & Western Railway, com-
monly called the St. Charles Railway, is an electric
suburban railway running from Wellston in a north-
westerly direction to the city of St. Charles. About
twelve miles from Wellston on said railway, there is
a station, merely a platform and stopping place for
the cars, called Bonfils Station. From this station a
foot-path leads in a southwesterly direction a distance
of about one hundred yards and connects with Taussig
avenue. This avenue leads in a southerly direc-
tion and at a distance of about three hundred yards
from Bonfils passes along side of and to the left of an
abandoned stone quarry. This quarry extends back
from the road some distance and is almost surrounded
with brush and shrubbery.

Shortly before the disappearance of McCann the
Missouri river had been at a high stage and the water
from the river had run through the brush into this

quarry, so that at the time in question the water in the quarry, though it had then ceased to run in, was from six to ten feet deep. There was a steep bank on the west side of the quarry and a road not much traveled led off from Taussig avenue around back of the quarry on the west side. Two families lived on Taussig avenue about two hundred yards from the quarry. On account of the high stage of the Missouri river on the 18th day of June, 1903, and for sometime prior, the St. Charles railroad did not run cars through to the city of St. Charles, but stopped at Bonfils Station and from there returned to Wellston.

The defendant visited Bonfils Station on the 17th day of June, 1903, stating upon his return that he had been out in St. Louis county visiting some rich English friends. For sometime before the disappearance of McCann the defendant had been talking about his wealthy English friends in St. Louis county, whom he had been out to visit and told McCann that he, McCann, and his wife were invited out there. The day McCann disappeared the defendant talked to him about certain pension papers which he claimed to have and on which he said $2,500 would be due the 19th day of July, following; that his English friends would advance him one thousand dollars on these papers and asked McCann to go along with him to get the money; said he wanted to use the money in his defense of the suit for divorce brought by his wife. At the supper table on the 18th day of June, 1903, McCann remarked about the defendant eating so little, and the defendant replied that they would have a supper later on. After supper McCann told his wife, in the defendant's hearing, that they were invited out to Mr. Barrington's friends that evening for supper, and suggested as to what dress she should wear. While Mrs. McCann was getting ready her husband came to her room and told her she need not dress for the supper as she was not invited. Mrs. McCann asked her hus-

band about the mistake and he answered that it had been his misunderstanding. After supper, when McCann, his wife and Leonard were sitting in the front yard, the defendant came out of the house and asked Mrs. McCann if she had any headache powders. Mrs. McCann said she had not, and as she had a severe headache, she would like to have one herself. McCann said he would go and get the powders. He got five dollars from his wife and after going across the street to get the returns on the races, McCann came back and asked the defendant to go with him to the drug store to get the headache powders. Defendant and McCann went away together, McCann saying to his wife, after he was outside of the gate, that he would return in a short while. This was between 7:30 or 8 o'clock in the evening. McCann never did return, but the defendant returned alone to the Leland hotel about 9 o'clock on the morning of the next day.

Where McCann and the defendant went and what they did from the time they left the hotel until they were seen at Wellston at 10 o'clock that night is known only from the statements of the defendant, except that they were seen on the street car about 9 o'clock by a witness who heard them ask as to the time the St. Charles car left Wellston, and heard the defendant say that if they couldn't catch the 9 o'clock car they could catch the next one, and the further fact that the defendant had in his possession upon his return a flashlight tintype picture of himself and McCann taken at the Suburban Garden that night. At 10 o'clock on the night of the 18th of June, 1903, McCann and defendant boarded a car at Wellston and rode to Bonfils Station. There were but six passengers on the car when it left Wellston, and all but McCann and defendant had left the car before its arrival at Bonfils. On the car the defendant sat in the back seat and McCann in the seat next in front. McCann talked to the conductor and the passengers; he told the conductor they

were going to Bonfils on business; at that time two
fares had been collected and it was three fares to the
river; he jokingly told the conductor that he did not
think he would pay any more fare; the conductor re-
plied that he guessed he would and McCann then re-
marked, "Oh, I don't know, how big is your gun?"
McCann then paid the fares. The defendant held his
head down and said nothing. McCann inquired of the
conductor as to when the cars left Bonfils for the city,
and on being informed that another car would be there
later that night said he wanted to get back on that car.
They got off the car at Bonfils, McCann getting off
first, and the motorman saw them start up the little
path leading to Taussig avenue, walking side by side.
The car reached Bonfils at 10:35 p. m. and was due to
leave on the return trip at 11:10 p. m. About fifteen
minutes after McCann and defendant left the car, the
conductor and motorman heard, coming from the direc-
tion of the quarry, a pistol shot, then a cry, followed
by a second pistol shot. This was also heard by other
witnesses living near the quarry. The next day, June
19th, the defendant was seen alone, by the conductor
and motorman of the first car going to Bonfils about
5:30 in the morning. The defendant was then walking
east toward the city, being about three or four miles
from Bonfils, and about eight miles from Wellston.
These railroad men passed the defendant several times
that morning as he continued his walk toward the city.
The defendant's trousers were muddy and wet from
the knees down, and each time, except the last, as the
car approached, the defendant went away from the
track toward a house or behind a shed, or shifted his
hat to the side of his head on which the car was pass-
ing, as though attempting to conceal his identity. When
McCann and defendant went out the night before, Mc-
Cann was carrying a cane and wearing a straw or
Panama hat; the defendant was wearing a black hat.

198 Sup—4

These were the hats respectively worn by these parties that night when the flashlight picture offered in evidence was taken at Suburban Garden. When defendant returned on the morning of the 19th, he was carrying a cane and wearing a straw or Panama hat, both of which articles were afterwards identified as the property of McCann. Arriving at Wellston, the defendant boarded a car and went on down town. When he arrived at the Leland hotel, about 9 a. m., Mrs. McCann had left for her place of business in the city, hoping to find her husband there or at some of the hotels or places frequented by him. The defendant entered the hotel by way of the basement. Charles and Oney Morrison were in the house and Charles Morrison admitted the defendant into the basement by the side entrance. His clothing was wet, spattered with mud and soaked with blood; the blood had become thick and black. Morrison asked him what was the matter, and he said: "Charley, I have had a terrible time; I invited McCann out to take supper with me, and that is what I get for it." He asked where Mrs. McCann was and also Mr. Leonard, and said he wanted to get his clothes off as soon as he could, as he didn't want Mrs. McCann or Leonard to see them. He then went up stairs and in a short time called Morrison and told him to "take these clothes and get them off the place right away." Morrison told him he had no place to put them, and the defendant then told Morrison to wash the clothes and put naphtha oil and lye in the water to take out the blood stains. When Morrison was getting the clothes in the defendant's room, he saw a watch on the bed and saw the defendant turn quickly and take a revolver from the bed and walk across the hall and put it in his trunk. In explaining to Morrison how the blood got on his clothes, the defendant said that he and McCann went out to the Suburban Garden and there met two men and two women; that McCann and one woman went down in the weeds and the woman

screamed; that the two men ran to her assistance and knocked McCann down; that defendant ran there to help McCann and was knocked down, falling on McCann; that the men went away, got a carriage, came back, made up with McCann and kicked the defendant, and left him unconscious, lying in the water in a ditch, and that by rolling over he got the blood on his back. He further said in the same conversation that McCann had cut a woman's throat out there and that "he never will come back; if he does come back, I will kill him." The defendant's fingers were cut and his thumb was swollen so that Morrison had to assist him to put on his shirt. The defendant visited a barber shop that morning; his right hand was swollen and he made the statement that he had been out for a horseback ride and that the horse fell on top of him in a ditch about six feet deep, and he laid there unconscious for a while, then got up and came back to town.

After looking at different places in the city for her husband, Mrs. McCann returned home about noon and found the defendant there. She asked him where her husband was; he answered that he could not tell her, and if he did tell her it would break her heart. He then told Mrs. McCann the story of the trouble he and McCann got into at Suburban Garden, but it was radically different from the story told Morrison. As told to Mrs. McCann, in the altercation McCann struck the defendant with his cane and then threw the cane to the defendant and told him to keep it as a souvenir; that after the difficulty, while the two men were gone for the carriage, McCann gave defendant instructions as to what to tell his wife when defendant returned; to tell her that he, McCann, had gotten into this trouble and was ashamed to see her, but that he might need money, and on Friday evening he would call her up on the 'phone and that defendant should come to the

'phone first; that McCann then gave the defendant the ticket on the races for $164 (which ticket the defendant then had in his possession) and told him to collect it if it had won and buy himself a swell suit of clothes, take out $27.50, which he said McCann had borrowed from him that night, pay the help, etc.; that McCann told him to take charge of the house and look after things until he, McCann, came home Saturday afternoon; that defendant answered that he could not run the house with Tom Leonard there and McCann said to have Leonard go away. The defendant told Mrs. McCann many other things in connection with the trouble at Suburban Garden, as shown by the record, which would require too much space to insert in this statement. He said that the two strange men came back with the carriage, put the woman in and McCann got in voluntarily; that defendant told McCann not to go with those fellows, and the strange man kicked defendant and threw him in the ditch, where he remained until five o'clock the next morning, when he waked up bloody and spattered with mud.

During the next few days the defendant proceeded to carry out what he claimed were McCann's instructions, by taking charge of the hotel, collecting money on the ticket on the races (Mrs. McCann insisted on going with him and got part of the money); paid the Morrisons, and had Leonard leave the hotel. He had Morrison go with him to the stable on the hotel property and asked him if he had ever taken care of any fine race horses and as to how much it would cost to fix up the stable. Morrison remarked that he wished McCann had paid him what he owed him before leaving; the defendant said he had gone to Kentucky and asked, "How much is it, Charley, he owes?" On being told the amount McCann was indebted to Morrison, the defendant remarked, "That is what McCann told me to pay you last night when he left me." Mrs. McCann was fretting and alarmed over the absence of her hus-

band and the defendant tried at different times to calm
her. At one time he assured her that he had received
a message from McCann at Centralia, Illinois; he vis-
ited Mrs. McCann at her office and said, "I have a
message from Jim, now cheer up; shortly after you
left the house—a woman did the talking, but it was
from Jim, and he said for you to send him $300 to
Centralia, Illinois, by Tuesday morning." Mrs. Mc-
Cann said, "Are you positive it was not Mr. McCann
talking?" and the defendant replied: "It was a woman;
she came to the 'phone two or three times before she
finished the conversation, as if she would go away and
talk with McCann and then come back and talk to Mr.
Barrington." Mrs. McCann suggested that probably
it was a trained nurse, and the defendant said, "The
woman that spoke talked very sharp and pert, and said,
'Tell Jessie' so and so, in a very important way." De-
fendant said he asked the woman if he, defendant,
should come and bring the money. Mrs. McCann sug-
gested that if the defendant wanted to go and take the
money or send it to Centralia she would go with him,
to which the defendant replied, "I will find out," and
when asked, "How?" answered, "By long distance
telephone; they haven't reached there yet, but will be
there Tuesday morning." When Mrs. McCann talked
about sending her husband money, the defendant said,
"Mrs. McCann, my laws, after Jim has done all this,
would you send him any money? I never knew any
woman to have such love for a man as you have for
Jim McCann." Mrs. McCann sent registered letters to
Centralia and Vandalia, which letters were returned
to her. The defendant had a young man named Mit-
chell write a pretended letter from McCann to the de-
fendant, stating that he, McCann, could not return just
yet, that he was all right, in good hands, and asked the
defendant to look after the house and do what the writ-
er had told him to do. He also arranged with him (Mit-
chell) to call the defendant up on the telephone at the

Leland hotel and tell him that McCann had been found at Chicago and would return in a few days. Mitchell telephoned as requested. The defendant was not at the hotel at the time and when he returned Oney Morrison met him in the hall and said, "Mr. Barrington, some-one called you over the 'phone, and says your friend has been found in Chicago," the defendant says, "Oh, yes, I know who it is; it is a man looking for Jim, I expect he has found him; I know who it is and where he found him;" and the defendant called Mrs. McCann to the telephone, and had him repeat to her what he had said to the defendant. Mitchell was a witness at the trial and testified that he knew nothing whatever about McCann and that what he did in the matter was at the suggestion and request of the defendant, the latter even writing the letter in pencil and handing it to Mitchell to copy, which he did. This letter was taken by the defendant to the telegraph office, where the defendant asked the operator to put it in one of the company's envelopes and address it to Col. F. Seymour Barring-ton, 2902 Franklin avenue, and have it delivered at one o'clock that day. The letter was delivered accord-ing to the defendant's instructions and was read by Mrs. McCann. For several days following her hus-band's disappearance, Mrs. McCann begged the de-fendant to go with Morrison or Bohmeyer to the Su-burban Garden and see if they could not get some trace of McCann. The defendant, although at different times promising to go, did not, but each time made excuses. On Thursday night, June 25th, just one week from the night McCann disappeared, the defendant was placed under arrest. He told the officers the story of what occurred at the Suburban Garden when he last saw McCann which differed materially from the account which he had previously given. The officers took him to the Suburban Garden that night, and he showed them the place where he said the difficulty had oc-curred. The next morning the defendant was released.

On Friday, June 26, 1903, about four o'clock in the afternoon, Louis Tucker was driving by the stone quarry near Bonfils Station and seeing an object in the water, went to investigate. He found that it was the dead body of a man in a nude state, floating in the water on its back. It was in the far corner of the quarry. Tucker notified the neighbors and several viewed the body. On the next day, Saturday, an inquest was held, but a careful examination was not then made. The body was removed from the pond and buried on the bank of the quarry. The next day, Sunday, the coroner returned, accompanied by Dr. Randle and Dr. Koch. The body was then exhumed and the post-mortem held. The examination disclosed two cuts by a sharp instrument; one extending from the angle of the jaw on the left side round to the front about half an inch beneath the jaw bone; the other extending from the corner of the mouth, a little above, back two and a half or three inches. In probing on the left side of the face, it was found that the upper jaw was fractured, almost shattered, and the probe followed a canal just beneath the whole part of the cheek bone structure to the arch and into the brain cavity. One bullet was found in the brain substance, and another was found on the right side just beneath the temporal arch, flattened against the bone. It was not found where the second bullet had entered, but witness testified it had evidently entered from the left side. The wound from the bullet beneath the temporal arch was not necessarily fatal, but the one found in the brain substance was fatal and of such character that death would probably result instantaneously. There were also two deep gashes found on the left thumb.

The body was identified by many witnesses as the body of James P. McCann. The identification was made by the general appearance of the body, the teeth, particularly the two upper front teeth, by a mole a little to the left of the right nipple, b ya scar below the navel

caused by a burn, and by McCann's property found in the vicinity of the crime. Two shoes and a sock were found at different times, before the body was discovered in the pond, about two hundred yards from the quarry, near the track of the St. Charles railway. These were fully identified as McCann's property, and as the shoes and one of the socks he wore when he left on the night of the 18th of June. There was also found near the pond a pocketbook, a blood-stained razor handle and four 38-calibre cartridges. The pocketbook was identified as McCann's. In September, 1903, some workmen, while at work on the St. Charles railway fixing a bridge, about three-quarters of a mile from Bonfils and towards St. Louis, having occasion to go out eighty or ninety feet from the track, where the weeds and brush were as high as a man's head, found a coat, shirt, an undershirt and gold buttons, one with the letters, McC engraved thereon. This clothing and the buttons were also fully identified as McCann's.

On Saturday, June 27, 1903, Mrs. McCann told the defendant that he would have to take his trunk and leave the house; he said, "Mrs. McCann, you are turning me out of the house penniless." He then asked her to pay for the clothes that became soiled defending Mr. McCann in that fight; he said, "Mr. McCann told me I should have it." Mrs. McCann says, "If he is alive he will pay you," and the defendant replied, "I want you to pay me, I don't want to wait for him." He then stated that he did not want to move in the day time, that the neighbors would see him and make remarks about it. This was about eleven o'clock in the morning. The defendant left the house and when Mrs. McCann went to the front door the defendant says, "Mrs. McCann, do you want to see Jim? I have seen him three times from the day he has gone, talked to him, if you want to see him I will arrange to see him this evening, and you can take your sister along, and if you think he wants something, you can take him

anything you want. We will take it to him, and if you
don't want to give it to me, you can get disinterested
parties, but I don't want Jim to see you personally,
he is too cross. I will see him this afternoon and come
home and tell you what he said.'' That day the de-
fendant hired an expressman to take his trunk from the
Leland hotel to the Union Station, and cautioned the
expressman not to tell any one where he was taking
the trunk. About four o'clock in the afternoon of the
same day, the defendant was again placed under arrest
and taken to the mounted police station. That night
about eight o'clock the defendant was taken in the
patrol wagon to the office of the chief of police at
the Four Courts. A number of persons rode in the
wagon with the defendant. A board about a foot wide
extended horizontally along the outside of the wagon
above the wheels, and was called a mud guard. The
defendant was sitting in the wagon on the right side,
his back to the side of the wagon. On the way the
defendant was noticed making nervous hitching move-
ments and reaching back with his right hand; later that
night, directly back of where the defendant had been
sitting, a watch, locket and ring were found on the mud
guard of the wagon, which were fully identified as the
property of McCann in his life time.

At the chief of police's office the defendant was
examined as to McCann's disappearance; he was con-
fronted with the railway men, who identified him as
one of the men who went to Bonfils on the street car
on the night of the 18th of June, 1903, and returned
alone the next day. He then, for the first time, ad-
mitted that he had gone to Bonfils that night, and from
that time on changed the scene of the trouble between
the strangers, McCann and himself on the night of
the 18th of June, from the Suburban Garden to Bonfils
quarry, and with this exception, told the story much as
he had told it before. While at the chief's office, the
trunk the defendant had sent to Union Station was

brought in and McCann's cane and revolver taken therefrom. This revolver was produced at the trial and identified as the revolver sold to McCann a short time before he disappeared.

On the part of the defendant Dr. Gradwhol testified that he was a physician and surgeon of six years' practice; that he was post-mortem physician to the coroner of St. Louis city and had made a great many post-mortem examinations. That *rigor mortis* is a stiffening which sets in in the muscles of the body after death, due to the coagulation of the acids of the muscles; that it begins first in the muscles of the lower jaw, and then the limbs, and then the body becomes limber; that in the summer *rigor mortis* begins immediately after death; immediately upon the moment of death, there is a beginning of the contraction or stiffening; the length of time it lasts depends upon circumstances; in June when the thermometer is about 80 degrees or a little higher in a man who is shot, if the body is lying exposed to the elements, in a high temperature, I don't believe *rigor mortis* would last more than forty-eight hours at the most in the summer; it would not be found in a body that had been dead a week. If a bullet were to enter the brain here, there would be some hemorrhage and an injury to the brain matter of that part, that is, the part of the brain that controls the function of speed; if the bullet entered there about an inch, whether the shot would kill him or not, I would say that he could not give any outcry; if that should enter the left side of the brain of a right-handed man that would cause paralysis of speech; a shot in that part of the brain is not necessarily fatal. That there is a difference between shooting a bullet into a dead man and shooting it into a live man; in the first instance, there would be a difference in the direction it would take; a bullet fired into a living man is apt to be deflected in its course through the muscle. The muscle in a living man would deflect a bullet like bone,

while in a dead man it would follow a straight course. A bullet fired into a live man, where it strikes a blood vessel would cause a hemorrhage. This witness identified one of the teeth shown him as an upper incisor, one of the front teeth, and another as one of the bicuspids, lower, either one side or the other; situated about half way back in the arch from the middle line of the angle of the jaw, and stated that it could not possibly be one of the front teeth. That when a body is drowned in the summer time it will come up in about two days; depends on how warm it is; if it is very warm it comes up in twenty-four hours; depends on the amount of decomposition that takes place. In some cases it is possible to tell whether death was caused by drowning or shooting, provided there is not a combination of both. A drowned body shows water in the lungs and stomach, but a body thrown into the water after dead, when it hits the water, it is not possible for the water to enter the stomach or lungs. He stated that it was not possible to find the cause of death of any individual without examination of every vital organ of the body, which includes the organs of the chest and abdomen. He further stated that it had been his experience with bodies that have been in the Mississippi river water in the summer three or four days, that it is a matter of almost impossibility for relatives of these individuals to recognize them; that the features of these individuals are not recognizable. That the effect of decomposition of that kind is to fill the tissues of the body with gas; a body swells up twice its usual proportions when decomposed to that extent. The eyes are protruded from the sockets, the jaws blown out, the lips distended, the tongue is swollen and hangs out sometimes five or six inches, the shoulders, hands and arms are swollen and the abdomen extended; that is the way it is when seven or eight days in the water. The position of the face of a body that was found in the water which had been either drowned or shot would de-

pend on the way in which the gas formed in the body; as a usual rule you find the body with the face down, but sometimes they swing around.

Upon cross-examination this witness stated that if the person had died or been killed in the night time and was thrown into water eight or ten feet deep shaded with banks and trees, never exposed to the sun or long exposed to the atmosphere, it would depend on the temperature of the water. If the water was cold, it would remain an indefinite time. If the body was killed and thrown in in the night time and the water shaded and still, provided that the body remains in one place and submerged, I don't believe it would decompose very much, if it was anchored there, submerged, that is, in a cold place. If it was put into one place, where the water was still and cold, that is, below 60 degrees Fahrenheit, I don't believe it would decompose rapidly; a little more above 60 it would be more susceptible to decomposition, and a little below less; there might be circumstances under which a body would remain two days or three weeks under the water; bodies have been in cold water six months; it all depends on the atmospheric condition; a light body would rise quicker than a heavy one; *rigor mortis* appears more rapidly in bodies in water than on land; I have never seen it continue longer in a body than three days.

Defendant offered evidence tending to show the character of business Mr. and Mrs. McCann were engaged in in Chicago in 1902; that they were engaged in get-rich-quick concerns and matrimonial agencies, and that the matrimonial agency in St. Louis was a continuation of that business in Chicago and only removed to St. Louis, and that McCann was connected with it as well as Mrs. McCann; that in this business McCann made two or three hundred enemies who pursued him and wrote threatening letters to him, to show the probability of his being foully dealt with by some of these enemies; defendant also offered two affidavits for

search warrants and a number of transcripts in criminal proceedings, issued on the 3d of September, 1902, against McCann and others. This evidence was objected to by the State and was excluded, to which the defendant excepted.

Defendant also offered evidence tending to show the domestic relations of Mr. and Mrs. McCann, one witness testifying that on one occasion McCann slapped his wife, and another that Mrs. McCann had a black eye just a few weeks before McCann disappeared and that she had it at the time he disappeared. This witness on cross-examination stated that Mrs. McCann told her that her black eye was caused by being struck in the eye with a ball, thrown by a boy as she was crossing the street.

Other testimony offered by defendant tended to show that on the 17th of June, 1903, he was at Bonfils Station in company with McCann. Charles Nelson, a witness for defendant, testified substantially to the following state of facts: I reside at St. Charles, Missouri; about the 17th or 18th of June, 1903, I was working for the St. Louis, St. Charles and Western, about one-fourth of a mile from Bonfils Station; that was during the high water and there were watch ropes there to keep people from passing down the electric lines. I remember of having seen the defendant there about the 17th of June, 1903; it was the middle of the week; they were going on their way towards the ropes and I was at the station and they started down; there were two men, they started up the left hand side of the track, up from the overhead bridge at Bonfils, turned toward the right and crossed the bridge and went toward the left down where my station was supposed to be, down a quarter of a mile. As far as I can remember the man who was with McCann was a heavy set fellow, silk hat, Prince Albert coat and a light pair of pants; he had a dark mustache; I couldn't say how big he was, I guess he was as big as the man with him, maybe a little

bigger; they were standing there talking quite a while and I left and went down the track about twenty feet where the shed is, and when I came back the big man was gone and the other man was standing by himself. I talked with the defendant quite a while after the big man was gone; I can't say how long he was gone. The defendant took to the left hand side of the track, went over the bridge and went back down to the station. On cross-examination he stated: I couldn't say which of the two men was the larger; I didn't pay that much attention; they were about the same size and build. I mean that the defendant wore a black Prince Albert coat and a light pair of pants. I never saw any cane. I don't know exactly when this was, think it was in June; it may have been a little bit earlier than the middle of the month. I went down to the shade tree and one of the men left; I didn't see which way he went. I didn't know but what the man who was with the defendant was some one he happened to meet out there and walked down the track with; they got off the car together, but didn't seem to have anything in common. A good many people were going down there at that time; getting off the cars and looking at the high water.

Defendant also offered evidence tending to show that late in the afternoon of the 18th of June, 1903, three strange men were seen near Bonfils quarry; that they had a horse and surrey. These men had fishing poles.

The defendant was a witness in his own behalf and denied having made many of the statements and admissions as testified to by Mrs. McCann, the Morrisons and other witnesses. He testified in substance that on the afternoon of the 17th of June, 1903, he accompanied McCann to Bonfils, where McCann was to have met some men concerning a racing scheme, but failed to meet them; that after reaching Bonfils McCann left him and was gone about a half hour; that when they went to the drug store on the night of the

18th of June to get the headache powders, McCann talked over the telephone to someone and then told the defendant that he was going to Bonfils to meet some parties and asked the defendant to go with him; that on the way out, missing the nine o'clock car at Wellston, they went to Suburban Garden, where the tintype picture was taken; that while at Suburban Garden the defendant loaned McCann $27.50; that they then returned to Wellston and boarded the ten o'clock car for Bonfils; that after getting on the car he suggested to McCann that it was too late to go out there that night and that they had better wait until the next day, but McCann said, "I have telephoned that I am coming and you had better go." That he sat down in the rear of the car and at first McCann sat by his side; that he told McCann he had a headache and didn't want to talk and that he, McCann, then got up and took his seat in front of him; that McCann told the conductor and a passenger he was going out on business. Arriving at Bonfils McCann preceded him off the car, and not finding the parties at the station as expected, they went up the path, McCann leading the way to where the little path intersects Taussig avenue, defendant protesting against going further, saying, "Jim, let us go back, you had a fool's errand yesterday, we don't want another at this late hour of the night;" that McCann told him to "come on, let us go down a little way." That they started south toward the quarry and had not traveled far when they heard a low whistle toward the quarry and then came upon two men standing on the side of the road by a horse and buggy; that the larger man said to McCann, "You made a nice fool of me to-night, why didn't you come out?" That McCann replied, "We missed the car and have been out at the Suburban Garden." That McCann then took out a cigar and lit a match on the wheel and that he saw the large man draw a pistol out of his hip pocket and put it in his front trousers pocket; that the two men told

them to get in the surrey, and that he called McCann
to one side and told him about the pistol and that he
didn't like the looks of things and wouldn't go any fur-
ther; that McCann told him they were "lodge men"
and it would be all right. The larger man, defendant
thought, was a man whom he had seen talking with Mc-
Cann a number of times at the Planters Hotel; that
the two men insisted on the defendant getting in the
surrey, and that he refused; that McCann talked pretty
rough to them and told them, "If you think you are
going to get the upper hand of me, you will be in hell's
fire before long." That about that time defendant was
knocked down; that he then heard a pistol shot and he
got up on his feet again and ran into the bushes, these
men pursuing him and McCann in turn pursuing them,
as though to defend him; that while running into the
bushes he gave a loud outcry and asked McCann if he
was going to let these men kill him, Barrington; that
when he got into the bushes the men overtook him and
one of them knocked him down and he remained uncon-
scious until he was awakened by the rain about day
break the next morning; that he only heard one shot.
That when he woke up the next morning he found his
hat was gone, and that he found a straw hat on the
ground which had a concave crease in it; that he picked
it up and put it on; that it was not McCann's hat;
that McCann's hat had a convex crease in it. He iden-
tified the cane offered in evidence and stated that he
found it in the road the next morning, and that it orig-
inally belonged to McCann, but had been given to de-
fendant by McCann; that he was carrying the cane on
this night, it having been handed to him by McCann
when they got off the car at Bonfils and that he dropped
it when he received the first blow; that he looked around
and found nothing else and started to walk to town;
that the reason he walked to Wellston and then took
the car was because he didn't know he had any change,
till at Wellston, when he found fifteen cents in a side

pocket. He admitted that he had not told the truth to Mrs. McCann, but had told her the story of the Suburban Garden difficulty because he had been told by McCann never to tell Mrs. McCann what had happened when they were out together; that he thought McCann would be home in a few days and he didn't want Mrs. McCann to worry; this was also his explanation of the Mitchell letter. He denied knowing anything about the jewelry found on the mud guard of the patrol wagon and also denied that he ever shot Jim McCann or was in any manner implicated in killing him; that he saw the body, but did not know whether it was the body of McCann or not.

The State in rebuttal offered several witnesses who testified that McCann was at home on the afternoon of the 17th of June, and that he slept all afternoon.

This is a sufficient indication of the principal features of the testimony upon which this case was submitted to the jury to enable us to determine the legal propositions involved in the record. During the course of the opinion we will, in addition to this statement, refer to and discuss certain features of the testimony developed at the trial.

At the close of the evidence the court instructed the jury, and after argument of counsel the cause was submitted, and the jury returned their verdict finding the defendant guilty of murder of the first degree as charged in the indictment. The instructions given by the court, as well as those requested by the defendant and refused by the court, will be given due consideration in the course of the opinion, hence there is no necessity for their reproduction here.

Sentence and judgment was entered of record in accordance with the verdict of the jury. Motions for new trial and in arrest of judgment were timely filed and taken up by the court and overruled. From the judgment in this cause the defendant in proper form

and in due time prosecuted his appeal to this court and the record is now before us for consideration.

OPINION.

The record before us presents numerous assignments of error on the part of the trial court as a basis for the reversal of the judgment in this cause. We are confronted in this cause with a record disclosing one of the gravest charges of crime known to the law. Its importance and the serious results flowing from the judgment demand a most careful consideration of the propositions presented to us for review.

Learned counsel for appellant, in an able presentation of this cause, have clearly indicated the legal propositions involved, as well as their views upon such propositions. We will treat the assignment of errors in the order suggested by the brief of counsel, and will give them such consideration as their importance merits and demands. The correct solution of them must at last be reached by a fair, reasonable and impartial application of the law to the subjects and questions presented.

I. It is insisted by appellant that the court erred in overruling the 7th ground assigned in the motion to quash the indictment. This ground in the motion to quash was, ''Because the names of witnesses on the part of the State are not indorsed on said indictment.'' The motion to quash was filed October 6, 1903, and in support of this motion defendant states: ''That the prosecuting attorney, at the time of the return of said indictment into court, and prior thereto, had knowledge of certain witnesses on the part of the State in this cause, and that said prosecuting attorney intentionally refrained from indorsing the name of one or more of said witnesses on said indictment, for the purpose and to the end that said witness or witnesses should be sprung as a surprise upon defendant in the trial of said cause, and so that defendant could not make adequate

preparation to meet the evidence and testimony of said witness or witnesses. That the names and place of residence, identity and whereabouts of said witness or witnesses are unknown to defendant, and that he is entitled, as a constitutional right, to know the name or names of said witness or witnesses, and to have his, her or their names indorsed upon any indictment against him charging any crime concerning which they are to appear against him. That defendant is a native citizen and subject of the King of Great Britain and Emperor of India, and as such is entitled, under and by virtue of the treaties now existing between the Government of the United States and Government of Great Britain, as well as under the laws and Constitution of the Federal Government, and also under the Laws of Nations to a fair and impartial trial of said cause, to be fully informed of the nature and cause of the accusation against him, and to know who are the witnesses against him in said cause, in order that he may have a fair trial thereof, and secure justice therein; and under said treaties, laws and constitutional rights, as well as the laws of this State, defendant alleges this ground to quash the indictment.'' The court heard testimony upon this ground of the motion to quash, and the motion being submitted to the court, was overruled, and it is this action of the court of which appellant complains.

The evidence introduced by appellant upon this ground in the motion fails to disclose that the State purposely withheld the name of any witness from being indorsed upon the indictment. The witness to whom the principal complaint is addressed was Asa Mitchell, and the prosecuting attorney, who was called as a witness by the appellant, testified that at the time the indictment was returned he knew nothing about the evidence that Mitchell would give and that the names of all the witnesses who appeared before the grand jury were indorsed on the back of the indictment, and

that all the witnesses that the prosecuting attorney knew of were subpoenaed before the grand jury and they all appeared with the exception of two.

This complaint of appellant is predicated upon the provisions of section 2517, Revised Statutes 1899, which requires the names of all the material witnesses to be indorsed upon the indictment, but it must be observed from the same section that such requirement was not intended to exclude the State from introducing other witnesses not indorsed upon the indictment, for it is expressly provided, following the requirement to make the indorsement of all material witnesses, that other witnesses may be subpoenaed or sworn by the State, but no continuance shall be granted to the State on account of the absence of any witness whose name is not thus indorsed on the indictment, unless upon the affidavit of the prosecuting attorney, showing good cause for such continuance. In State v. Roy, 83 Mo. 268, there were no witnesses indorsed upon the indictment. The trial court sustained a motion to quash on that ground, which was affirmed by this court. In State v. O'Day, 89 Mo. 559, the ruling announced in State v. Roy, was approved, but it was clearly pointed out that under the provisions of the statute the State was not to be denied the right to introduce on the trial other witnesses than those whose names are indorsed upon the indictment, but that on the contrary, express license is given by the statute to do so, and in commenting upon the case of the State v. Roy, Judge Norton, who also wrote the opinion in the Roy case, said: "In the case of State v. Roy, supra, the indictment did not have upon it the indorsement of the name of a single witness. In the case now before us, the indictment had indorsed upon it the names of three witnesses, and in such case the presumption can and must be indulged that the indictment was found upon their evidence, and that the grand jury, in making the indorsement, complied fully with the mandate of the statute." This case

has been cited with approval on this question in State v. Steifel, 106 Mo. 129, and State v. Nettles, 153 Mo. 1. c. 469.

BURGESS, J., in the latter case, speaking for this court upon this subject, correctly and very clearly states the true rule. It was thus stated: "While the purpose of this statute is that the accused may know who his accusers are, and prepare to counteract their testimony, or to impeach or contradict them, if deemed necessary, it was not intended to deprive the State of the right to introduce witnesses other than those whose names are indorsed on the indictment, for it expressly provides that 'other witnesses may be subpoenaed or sworn by the State,' but at no time should the State be allowed to purposely refrain from indorsing the names of material witnesses on the back of the indictment, and then introduce them at the trial, and in this way take an undue advantage of the defendant."

In State v. Steifel, supra, during the progress of the trial the State entered a *nolle* as to George Clevlen who had been jointly indicted in that cause with the defendant and introduced him as a witness on the part of the State. The same contention was urged in that case, that Clevlen's name was not indorsed on the indictment, and responding to the contention upon that state of facts, GANTT, J., speaking for this court, said: "The fact that Clevlen's name was not indorsed on the indictment did not render him incompetent. The statute requiring the names of all material witnesses to be indorsed on the indictment is a most just and humane provision. It is right that when a citizen's liberty or life is endangered he should know the names of the witnesses by whom the charge is to be made good. By so knowing he can prepare his defense. It may be necessary for him to impeach some of these witnesses. The State ought not to ask a conviction, unless it can be obtained fairly and upon testimony that will stand the severest tests known to the law. But, while this is true,

it cannot be said, that, if the State discovers evidence that the grand jury could not obtain, the State shall not avail itself of this evidence if discovered before it closes its case. Indeed, section 4097 [R. S. 1889], expressly reserves to the State the right to call witnesses other than those whose names are indorsed on the indictment.'' [Citing State v. Roy, 83 Mo. 268; State v. Grady, 84 Mo. 220; State v. O'Day, 89 Mo. 559.].

From these cases the correct rules as to the application of this statute may thus be stated: First—If there are no witnesses indorsed upon the indictment, then, upon motion, it should be quashed, unless the prosecuting attorney offers to supply such omission, then the defendant should have a reasonable time after such omission has been supplied to prepare his defense. Secondly—If the State should indorse some of the witnesses on the back of the indictment and then purposely refrain from indorsing the names of material witnesses on the back of the indictment, with a view of taking an undue advantage of the defendant, then the court would be warranted in promptly quashing the indictment or requiring the prosecuting attorney to supply such omission, and give the defendant a reasonable time in which to meet the testimony of such material witnesses. But by no means is it contemplated by this statute that the State shall be denied the right to introduce on the trial other witnesses than those whose names are indorsed on the indictment. Until the contrary is shown the presumption must be indulged that the indictment was predicated upon the testimony of the witnesses whose names are indorsed upon it, and if the State, subsequent to the returning of the indictment, discovers additional witnesses who are material, then by express provision of the statute it is contemplated that such witnesses may be subpoenaed and sworn by the State upon the trial of such indictment. Aside from all this it is manifest that the defendant has no right to complain of any prejudicial error upon the action

of the court upon this motion. This motion was filed October 6, 1903, and the record discloses upon the showing made upon such motion and plea in abatement that appellant had notice of these additional witnesses which were introduced by the State at the trial. The trial did not occur until the 23d of February, 1904, some three or four months subsequent to the time of which the record discloses that he had notice of these witnesses. We know of no rule of law or practice which would require the prosecuting attorney, upon the discovery of additional witnesses and as to the materiality of their testimony, to notify the defendant of the names of such witnesses and as to what their testimony would be upon the trial.

There was no error in the action of the court overruling the motion to quash upon the 7th ground alleged as herein indicated.

II. It is urged by appellant that the trial court committed error by permitting counsel for the State to cross-examine the defendant while on the stand upon matters and subjects not referred to in his examination in chief. This complaint, insisted upon by appellant, of error on the part of the trial court, can only be fully appreciated and understood by a reproduction of such cross-examination just as it occurred in court. We will, therefore, be pardoned for burdening this opinion by inserting it here. It was as follows:

"Q. Where is your home? A. England.

"Q. At what place? A. I decline to answer that.

"Q. On what ground? A. On the ground that I don't wish to inform my family of this. The disgrace is enough for me without my family being brought into it. I am not involving my mother and sister in this affair.

"Q. That answer isn't sufficient in law? A. For family and private reason are the only reasons I can give you, and they are the truthful ones.

"Mr. Grover: The witness can refuse to answer.

"The Court: He has offered himself as a witness.

"Mr. Grover: Then we object to the question as irrelevant and immaterial.

"A. I have already given a truthful answer to the question—simply private and family reasons.

"Q. I ask you again, where is your home? in England? A. I decline to answer.

"Q. What is your ground for refusing? A. My ground is just what I have just stated.

"The Court: The question is proper. The witness ought to answer. A. I decline to answer any question that will involve my family, for private and personal reasons.

"Mr. Johnston: The State insists upon the witness being compelled to answer. The court has ruled on it.

"The Court: Mr. Barrington, the ruling of the court is that the State is entitled to this. You offered yourself as a witness here, and the court should know and the jury should know what your residence is in order to properly weigh your testimony and pass upon your credibility as a witness. Do you still refuse to answer?

"A. I don't think it is right. It will involve my family. Part of the year I live in Brighton, and part in London, when in England.

"Q. Where is your home in England? A. I have answered. Part of the year in Brighton, and part in London, when in England. Many years I have been in India, away from England.

"Q. When were you last in England?

"Mr. Grover: We object to that as irrelevant.

"A. In 1902 — the first month in 1902.

"Q. Where were you living at that time in England?

"Mr. Grover: We object to that as irrelevant, immaterial and not proper cross-examination.

"The Court: Objection overruled. [Formal exception by. defendant.]

"A. January, 1902, near Brighton.

"Q. What place near Brighton?

"Mr. Grover: We object to that for the same reason.

"The Court: Objection overruled.

"A. I decline to answer that question. I am not involving my family in this matter at all. It has nothing to do with this. I decline to answer any questions that will involve my mother and sisters. It is a disgrace to be charged — I will bear the disgrace.

"Q.. Do you decline to answer that question? Where were you born? A. India.

"Q. When did you first come to the United States? A. I have been in the United States twelve times altogether.

"Q. When was the last time you came to the United States? A. January, 1902.

"Mr. Grover: We object to that as irrelevant, immaterial and not proper cross-examination.

"The Court: Objection overruled.

"Q. What time? A. January, 1902.

"Q. Where did you land when you came here the last time? A. Halifax, Nova Scotia.

"Q. Were you in New York in that year?

"Mr. Grover: We object to that as irrelevant and immaterial and not proper cross-examination. Incompetent, because he is prisoner on the stand.

"The Court: It goes to the credibility. [Formal exception by defense.]

"Q. I will ask you if in Brooklyn you were married under the name of Barton? A. I never was. The only marriage I ever had in my life was with Wilhelmina Grace Cochrane, in St. Louis.

"Q. You were never married in Brooklyn? A. No, sir.

"Q. Do you know Lieutenant Roby? A. I do not. Lieutenant Roby does not exist — never has.

"Q. Did you ever go under the name of Burgoyne? A. I never did. I never went under any name except Frederick Seymour Barrington, or F. Augustus Seymour Barrington.

"Q. What did you make this change for in traveling? A. For family reasons. It is my private reasons. They are my own names.

"Q. What has been your business in the past year or two?

"Mr. Grover: We object to that as irrelevant and incompetent, and not proper cross-examination.

"The Court: Objection overruled. [Formal exception by defense.]

"A. I was sent down January 31st, or the beginning of February, to the Work House for marrying Grace Wilhelmina Cochrane, the mayor exonerated me and I went with a man named Mr. Gillespie to manage that saloon on Broadway. From there, I made an arrangement with Mr. McCann to go to the Leland, and from the Leland I came to prison.

"Q. What was your business the year before you went to the Work House?

"Mr. Grover: We object. We object. We have had a fight over Mrs. McCann in Chicago.

"The Court: I permitted you to ask her about Chicago. I didn't permit either of you to go into matters except their general reputation.

"Mr. Grover: Then Your Honor holds it is entirely a matter of impeachment.

"The Court: Certainly. It has nothing to do with the case except as to the credibility of the witness.

"Mr. Grover: We object to it as incompetent, irrelevant and immaterial and not the proper cross-examination. We object to it as incompetent because it is the prisoner on the stand.

"The Court: Objection overruled. [Formal exception by defense.]

"Mr. Johnston: If he wants to avail himself of his constitutional privilege for fear of incriminating himself, that is a constitutional privilege.

"Mr. Grover: We object to that remark. We object to the State's making remarks of this kind.

"The Court: You gentlemen don't, refrain from making remarks, either side. You should not do so.

"Q. Answer the question? A. Part of the time with my sister in Ottawa. Part of the time in New York, a little while in Philadelphia, then Washington, D. C. From Washington I came here; that was after the death of my youngest sister. My youngest sister died in Washington, October, 1902.

"Q. The question was, What was your occupation? A. I had sufficient time of my own. I had recently left the army where I had been 13 years.

"Q. When were you discharged? A. When I went to South Africa as war correspondent, in the month of October, 1899, when I left Bombay, for Pt. Deborn, Colony of Natal. I arrived there in the month of November.

"Q. What was your occupation when you came to St. Louis before you married Miss Cochrane?

"Mr. Grover: We object for the same reason.

"The Court: Objection overruled. [Formal exception by defense.]

"A. Honest and honorable.

"Q. We know that, what was it? A. That involves other people and that is the reason why I do not wish to answer it. I was making arrangements—

"Q. The question was what was it — do you refuse to answer the question? A. I will bring other people's names into it that I don't wish to bring into it, who hold honorable positions in both the United States and England.

"Q. Was there anything dishonorable about it? A. I don't want their names to get a reputation from this case. If you ask me that question when this case is settled, I will tell you.

"Q. Will you answer that question? A. It is notoriety I should bring on others involving their names. I think other gentlemen in this court will understand that.

"The Court: I rule the question as proper, but if he doesn't want to answer—

"Mr. Johnston: I ask him to answer. Do you refuse? A. I decline to answer that question — I have other people's names—

"Q. Well, the question still stands to be propounded later. When was it you arrived in St. Louis? A. I think it was the 27th of December, 1902."

Upon this complaint the Attorney-General insists that the ground of defendant's motion for new trial, that is, that "the court erred in admitting illegal, irrelevant, incompetent and immaterial testimony," does not cover or include the point of improper cross-examination of defendant. Upon this proposition we will say that, if the objections at the trial were sufficiently specific to notify the trial court at the time of the nature and character of the objections and the reasons for them, the general assignment in the motion for new trial, that the court improperly admitted illegal, incompetent and irrelevant testimony, would properly preserve the point of improper cross-examination for review in this court. There were but few proper and sufficient objections and exceptions in this cross-examination; there were, however, some of them sufficiently specific to disclose to the trial court the reason of the objection. The court is presumed to know that the defendant is on the stand when he is sworn, and an objection upon a question being propounded to the defendant, that it is irrelevant, immaterial and not proper cross-examination, is sufficiently specific to preserve that point for review. Some

of the objections to the cross-examination extended further and stated not only that it was not proper cross-examination, but that it was incompetent because he is a prisoner on the stand.

The cross-examination of the defendant is as much the eliciting of testimony in the trial of a cause as the cross-examination of any other witness, and if a specific objection is made to a question propounded to the defendant, on the ground that it is improper cross-examination, for the reason that he is the prisoner on the stand, and the court overrules the objection and admits the testimony, that testimony, if in fact the objection was well taken, should be regarded as illegal, incompetent and irrelevant testimony, as much so as incompetent testimony from any other witness, and would be covered and included in the assignment of grounds in the motion for new trial, that the court had improperly admitted illegal, incompetent and irrelevant evidence. [State v. Noland, 111 Mo. 473.]

Recurring to the cross-examination complained of, it is clear that the testimony sought to be elicited by such cross-examination had absolutely nothing to do with the cause on trial, and it is equally clear that the questions and answers propounded to the defendant upon such cross-examination were so manifestly unimportant and immaterial that defendant could not have possibly been injured by them. Analyzing this cross-examination it will be observed, as to the inquiry of the defendant as to where his home was, counsel made the objection, simply stating that it was irrelevant and immaterial. This objection, as has been repeatedly ruled by this court, was not sufficiently specific, but conceding for the purposes of this case that the objection was well made and overruled, the defendant answered that "he lived part of the year in Brighton and part in London, when in England. Many years I have been in India, away from England." There was no testimony introduced by the State contradicting the answers of the de-

fendant, and we are unable to conceive how the mere
statement as to where he lived could possibly have any
tendency to injure the defendant, in the trial of the
case.   The same objection was made to the question
as to when he was last in England; he answered, "in
1902."   Then follows the question, "Where were you
living at that time in England?"   For the first time
counsel interposed an objection which is broad enough
and sufficiently specific, that is, that it was irrelevant,
immaterial and not proper cross-examination.   The
question was answered that in January, 1902, he lived
near Brighton.   Again we might stop to inquire as to
what effect and influence his answer to that question
could have upon the jury, that he lived near Brighton?
No one was introduced to contradict his statement.   It
was absolutely immaterial, and, we are of the opinion,
had no tendency whatever to prejudice the defendant's
rights or endanger in any way a fair and impartial
trial.   Upon further cross-examination, over the object-
ion of counsel for defendant, he answered that he was
born in India and had been in the United States twelve
times altogether, and that he landed at Halifax, Nova
Scotia, and that the last time he came to the United
States was in January, 1902.   What was said as to the
former questions is equally applicable to these.   We are
unwilling to believe that any jury of the most ordinary
intelligence would be influenced or prejudiced against
the defendant by the mere statement that he was born
in India, the number of times that he had been to the
United States, etc.   Proceeding with the cross-examina-
tion it will be noted that the question was propounded
as to whether he was in New York in that year, mean-
ing the year 1902.   There was an objection to this ques-
tion and the record does not disclose that it was an-
swered.   Counsel for the State then proceeded along
another line of cross-examination, and inquired of the
defendant if he was not married in Brooklyn under the
name of Barton.   To this question there was no objec-

tion whatever; defendant, however, answered that he never was, and that his only marriage was with Wilhelmina Grace Cochrane in St. Louis. Then follows an inquiry as to whether he knew Lieutenant Roby, and as to whether or not he had ever gone under the name of Burgoyne. To these questions the record fails to disclose any objection. The defendant also answered that there was no such person as Lieutenant Roby, never had been, and that he had never gone under the name of Burgoyne, and stated that he never went under any name except Frederick Seymour Barrington or F. Augustus Seymour Barrington. Then follows the question to which the most serious complaint is urged by appellant. That was: "Q. What has been your business in the past year or two?" To this question there was a proper objection, but it will be noted that the defendant's answer was not responsive to the question propounded. The inquiry by the question was as to what his business was; his answer was that he "was sent down January 31st, or the beginning of February, to the Work House for marrying Grace Wilhelmina Cochrane, the mayor exonorated me, and I went with a man named Mr. Gillespie to manage that saloon on Broadway. From there I made arrangement with Mr. McCann to go to the Leland, and from the Leland I came to prison." We submit that this answer was not called for by the question propounded and is in no way responsive to it. Being sent to the Work House and being sent to prison certainly is not to be regarded as a business, therefore, such statement was simply a voluntary one by the defendant, about which he has no right to complain. The inquiry was never made of him by counsel for the State as to whether he had been sent to the Work House for the commission of a misdemeanor; however. such inquiry, if he was convicted of a misdemeanor and sent to the Work House, under the rule as announced by this court in pursuance to the provisions of section 4680, Revised Statutes 1899, he having been introduced

as a witness, could have properly been made. [State v. Blitz, 171 Mo. 530; State v. Thornhill, 174 Mo. 364.]

Counsel for appellant insist that the defendant does not fall within that class of witnesses contemplated by section 4680, supra, hence the inquiry cannot properly be made of the defendant when on the stand as to his prior conviction of a criminal offense. A similar contention was urged in State v. Spivey, 191 Mo. l. c. 111, and responding to such contention this court said: ''The right to make the inquiry sought by the question is predicated upon section 4680, Revised Statutes 1899, which provides: 'Any person who has been convicted of a criminal offense is, notwithstanding, a competent witness; but the conviction may be proved to affect his credibility, either by the record or by his own cross-examination, upon which he must answer any question relevant to that inquiry, and the party cross-examining shall not be concluded by his answer,' etc. The defendant, if he goes upon the stand as a witness, falls within the purview of that section. The purpose of that law was simply to avoid the necessity of introducing records of convictions, and we can see no harm that can be done a defendant. If he has never been convicted he can say so, and if he has been convicted of a criminal offense and testifies in a case, whether the question is propounded to him or not, as to whether or not he has ever been convicted, the State, for the purpose of discrediting his testimony, could introduce the record of his conviction. Hence we are unable to see what harm this statute, under the rules of evidence, does a defendant. . . . The effect of the enactment of section 4680, which is a later statute, is simply to add an exception to the provisions of section 2637, supra, in respect to the cross-examination of the defendant.''

Proceeding further with the analysis of this cross-examination, defendant, in answer to a question as to his business, stated that part of the time he was with his sister in Ottawa, part of the time in New York, a

little while in Philadelphia, then Washington, D. C. From Washington he came here; that was after the death of his youngest sister. His youngest sister died in Washington, October, 1902. He further stated that he had been in the army thirteen years and was in South Africa as war correspondent in the month of October, 1899, and that his occupation after coming to St. Louis was honest and honorable, and that he arrived in St. Louis on the 27th of December, 1902. This closes the cross-examination which is complained of by appellant. We have read and re-read such cross-examination and have given it most careful consideration, and while, as before indicated, the court should have promptly checked all of such inquiries, we are unable to possibly conceive how such cross-examination could have had the slightest tendency to prejudice the interests of the defendant or in any way endanger his rights to a fair and impartial consideration by the jury of the competent and relevant testimony introduced in this cause. His answers manifestly were favorable to himself, and the State in no way undertook to contradict them; hence, if the jury gave any consideration to such unimportant and immaterial cross-examination, the only presumption that can be indulged is that they accepted his statements, not being contradicted, as being true.

In order to warrant the reversal of a judgment on the ground of an improper cross-examination, we take it that, giving the statute upon that subject a reasonable construction, such cross-examination must have some reference to matters material in the cause, to which the defendant, as a witness, did not refer in his examination in chief; or if immaterial, it must be along a line and upon subjects which would have a tendency to prejudice the jury against the defendant or his case.

In State v. Avery, 113 Mo. l. c. 499, BURGESS, J., speaking for this court, thus announced the rule: "The questions asked the defendant in regard to statements

198 Sup—6

made to Craycroft as to how deceased came to his death were, if at all material, not prejudicial to defendant, as his answers thereto were confirmatory of his statements in chief as to how the deceased did come to his death. There was no pretense that his answers to these questions were not true, and Craycroft was not put on the witness stand to contradict them. How, then, could defendant's case have been prejudiced thereby? He had stated as a witness that he was with deceased that night, and that he shot himself. But we do not think these statements material, and can see no importance to be attached to them; they certainly had no effect whatever on the jury in their deliberations, and their admission is no ground for reversing the judgment."

In State v. Lewis, 118 Mo. l. c. 86, the rule was thus tersely announced by this court: "In order to justify the reversal of the cause on the ground that the defendant was cross-examined with reference to matters to which he had not testified in his examination in chief, such cross-examination must have been in regard to some material matter, or something which had a tendency to prejudice the jury against the defendant or his case; and no such cross-examination was had in the case at bar."

The numerous cases to which our attention has been directed by learned counsel for appellant, in support of his contention upon this cross-examination, in no way conflict with the conclusions herein reached upon that proposition, nor with the cases cited in support of it. In State v. Hathhorn, 166 Mo. 229, defendant was charged with having in his possession a forged deed. Testifying as a witness in his own behalf, the trial court permitted the State's counsel to inquire of him as to whether he had, prior to the time he took Judge Freshour's acknowledgment to the deed to Mrs. Hathhorn, ever taken the acknowledgment of Judge Freshour to a deed to land of any kind, and this court said: "No testimony on that point had been elicited from defend-

ant. And for the like reason, defendant should not have been cross-examined as to whether defendant had ever before that time taken the acknowledgment of a deed of Judge Freshour's to which his wife, Mrs. Freshour, was not a party.'' It is manifest upon the charge upon which this defendant was being tried such cross-examination was improper.

To the same effect is State v. Trott, 36 Mo. App. 29. It will be noted in that case that the defendants were charged with gambling and while one of them was testifying in his own behalf the State's counsel made the inquiry if he ever played cards before for money. Before his counsel could object the defendant answered in the affirmative, ''Yes.'' Objection was then made to the question, which the court sustained, and the jury were instructed not to consider it as evidence. This error was one of the grounds upon which the case was reversed, and properly so, for in that case the cross-examination was upon a material matter not referred to by the defendant in his examination in chief, and manifestly had a tendency to influence the jury in the trial of the cause and thereby prejudice the rights of the defendant. Upon the question being propounded and answered the error in that cross-examination became complete, and was in violation of the express provisions of the statute, and the subsequent action of the court in excluding the evidence from the jury was insufficient to cure the error of such cross-examination and relieve it of its injurious effects.

The same may be said of State v. Graves, 95 Mo. 510. The defendant in that case was charged with larceny and the court indicating the character of cross-examination which would warrant a reversal of the judgment, said that if the defendant had been asked where he was on the night that the larceny was committed, or had been asked, ''were you at a certain point on the night of the larceny,'' and over his objection he was compelled to answer such question, it would constitute

reversible error. That is true, and it is apparent that that sort of a cross-examination was upon matters very material in the cause. The whereabouts of the defendant on the night of the commission of the larceny with which he is charged and is upon trial, was certainly an inquiry concerning a very material matter in connection with the commission of the crime. That is not this case. Here we have a line of cross-examination upon matters entirely foreign to the matter in issue. As indicated by the cross-examination, it has no reference to the time or place of the commission of this homicide, and we simply repeat in conclusion upon this proposition, that we are unable to conceive how such a cross-examination could operate to the prejudice of the defendant in the trial of this cause, and we are unwilling 'to believe that such cross-examination, in any manner whatever, influenced the jury in reaching their final conclusion and verdict as returned.

III. Appellant earnestly insists that the trial court committed error in its action overruling his application for a change of venue. The application of the defendant for a change of venue in this cause was predicated upon the alleged prejudice of the inhabitants of the circuit and county. The State joined issue with the defendant upon the facts alleged in his application and the court heard testimony of a number of witnesses, about forty-one witnesses testifying in support of the application, and about thirty-seven were introduced by the State in rebuttal of the showing made by the defendant.

We have in the statement of this case, upon the hearing of the application, indicated the nature, character and tendency of the proof offered by both the defendant and the State; hence the correct solution of this proposition must be sought in the application of the rules of law applicable to this subject to the facts as herein indicated. The defendant's right to have his case removed from the county and circuit in which it

was pending is purely statutory.     [State v. Lanahan, 144 Mo. 31; State v. Thompson, 141 Mo. 408; State v. Sanders, 106 Mo. 188; State ex rel. v. Wofford, 119 Mo. 408.]

It is made manifest from the disclosures of the record in this cause that the right of the defendant to a change of venue upon the facts alleged were most seriously and earnestly contested by the State.  The record discloses an immense volume of testimony introduced by both sides upon the hearing of the application.  In State v. Wilson, 85 Mo. 1. c. 139, the law as applicable to this subject was, by SHERWOOD, J., speaking for this court, thus tersely stated: "Regarding the application for a change of venue, it was based upon the ground of the prejudice of the inhabitants of the county against the defendant.  On this point witnesses were heard pro and con, and the decision of the trial court was final thereon, unless some abuse of judicial discretion was shown." [Citing State v. Whitton, 68 Mo. 91, and cases cited.]

The law is nowhere more correctly and clearly stated than it is in Bishop's New Criminal Procedure (4 Ed.), vol. 1, section 72.  The rule is there announced as follows: "The discretion is judicial, not personal in the individual judge.  The course of the courts in our States differs as to reviewing, in a higher court, a judicial discretion exercised in a lower.  There are States in which the higher tribunal will rarely or never interfere in this matter of changing the venue; but the better and more common doctrine is, that the decision of the lower court will be corrected in extreme cases of abuse, and in no other."

It is now the well-settled rule of law in this State that the granting of a change of venue in a criminal case rests largely in the discretion of the trial court, and where the trial court has heard the evidence in favor of and against the application, and reached a conclusion adversely to granting the change, such ruling will not

be disturbed by this court, and should not be unless there are circumstances of such a nature as indicate an abuse of the discretion lodged in such court. [State v. Clevenger, 156 Mo. 190; State v. Albright, 144 Mo. 638; State v. Tatlow, 136 Mo. 678; State v. Dyer, 139 Mo. 199.] The reason of this rule is well stated in the text in Ency. of Plead. and Prac., vol. 4, page 499. It is thus stated: ''Where the lower court is vested with a discretion to grant or refuse a change of the place of trial, its action will not be reviewed unless there has been an abuse of the discretion. The reason for this rule is obvious. Whether a change of venue is necessary to obtain a fair and impartial trial is not a question of law but of fact. A judge on the spot, viewing all the circumstances, and having knowledge of persons, facts, and influences, is much better qualified than is an appellate court at a distance, with only *ex parte* affidavits before it, to determine the fact whether or not it is true that the defendant cannot have a fair trial by an impartial jury in the county in which he is indicted or in which the plaintiff has commenced his suit.''

Applying the rules thus deduced from the authorities herein indicated to the facts as shown upon the hearing of this application we are then confronted with the simple question as to whether or not there is disclosed by the record in this cause circumstances of such a nature as indicates an abuse of the discretion of the trial court in denying appellant's application for a change of venue. Upon this proposition, it is sufficient to say that after a most careful scrutiny of the record upon the hearing of the application for a change of venue, we fail to find any disclosures in such record which would warrant this court in holding that there was an abuse of discretion by the trial court in denying appellant's application for a change of venue. There is an entire absence of any indication in this voluminous record of any feeling or prejudice on the part of the trial judge against the defendant; in fact, it may be noted

that in order that a full and exhaustive hearing might be afforded the defendant upon his application, the court refused to fix any limit as to the number of witnesses to be introduced.   The presiding judge of that court resides in St. Louis county, and doubtless was personally acquainted with a number of the witnesses who testified upon this hearing; at least he had the witnesses before him, saw them, with opportunities for judging of their credibility and the weight to be attached to their testimony that are not afforded the appellate court, and we are unable to point out in this record any circumstances in the least indicating an abuse of discretion.   It may also be added that the record does not disclose that the officers were burdened with any serious or extraordinay trouble in securing the panel of qualified jurors.   The county of St. Louis has a population of 50,000 or more, and we are unable to assent to the contention of appellant, under the testimony as disclosed upon the hearing, that he could not get an impartial jury and have a fair trial in that county.

Counsel for appellant earnestly insist that the inflammatory articles in the metropolitan press of the city of St. Louis denouncing the defendant, and theatrical performances in which the defendant was impersonated by one of the characters, had a strong tendency to prejudice the people of the county and thereby endanger a fair and impartial trial.   It is but common knowledge that the press complained of has a wide circulation in nearly every county in the State, and the same reason urged against St. Louis county could be made applicable to most any other county in the State as well as the county in which the defendant was tried. While St. Louis county is adjacent to the city of St. Louis, with the modern facilities for rapid transit, the people throughout the State are about as readily informed of the news by such press as the people in the county where this trial occurred.   The case of State v. Goddard, 146 Mo. 177, upon which appellant chiefly

relies for support of his contention upon this proposition, is by no means a parallel case. It will be observed in that case that the showing was all one way. The defendant introduced about 16 conceded reputable citizens of Kansas City who testified in support of the application for a change of venue. The State offered no evidence whatever in rebuttal of such showing. This court very properly held that as the prosecuting attorney offered no evidence in rebuttal his action in that respect was tantamount to a demurrer to the evidence, and as the defendant had made out a prima-facie case the change should have been awarded. Our attention is also specially directed to the case of State v. Hudspeth, 150 Mo. 12. The discussion in that case applicable to the proposition now in hand falls far short of giving any support to the contention of the appellant. The rule was simply announced, as it had been previously announced in the Goddard case, that where the defendant makes out a prima-facie case of prejudice of the inhabitants of the county against him, and his witnesses are not impeached either by cross-examination or by evidence *aliunde* or direct impeachment of their veracity, and the State offers no rebuttal, he is entitled to a change of venue. But proceeding with the discussion the court very clearly announced the rule applicable to this proposition, and said that "it has been uniformly held that the trial judges have peculiar advantages in weighing the evidence in these cases and their findings are not to be interfered with unless it appears they have abused their discretion." In that case, as in this one, newspaper clippings were offered in evidence, and this court, in the course of the opinion as to such evidence, used the following language and thus announced its final conclusion upon the question before it: "Various newspaper clippings from the Star and World, newspapers, giving various versions of the homicide, criticising the courts, grand jurors and jurors gen-

erally, were read, a practice well designed to promote changes of venue. We have carefully considered them and find they are not materially different from the usual comments in such cases.''

.The ruling upon this complaint of error must be adverse to the appellant.

IV. On Monday, February 8, 1904, the trial court ordered, of its own motion, that a *venire* for a special jury of 76 men be issued and directed to the sheriff of the county of St. Louis, and made returnable on Tuesday, February 23, 1904, at 9:30 o'clock. Appellant insists that neither he nor his counsel were present in court when this order for a special *venire* was made, and asserts that the court committed error in overruling his motion to quash the *venire* which was filed, on the ground of the absence of the defendant and his counsel at the time the order was made for it, and also committed error in the denial of the challenge to the array.

Upon this complaint of error the record discloses that neither the motion to quash the *venire* nor the challenge to the array was supported by affidavit or any other evidence. Section 2610, Revised Statutes 1899, provides that ''no person indicted for a felony can be tried unless he be personally present during the trial.'' The same section also contains the following: ''And provided further, that when the record in the appellate court shows that the defendant was present at the commencement or any other stage of the trial, it shall be presumed, in the absence of all evidence in the record to the contrary, that he was present during the whole trial.'' The record in this cause discloses that upon October 6, 1903, defendant filed a motion to quash the indictment, which was by the court overruled. On November 7, 1903, the defendant filed a demurrer to the indictment, which on the same day was overruled, and on the last-named date defendant filed a plea in abate-

ment, which was overruled by the court, and the defendant on that date was formally arraigned and entered a plea of not guilty. On December 24, 1903, the defendant filed an application for a citation for contempt against certain parties and a second application for a similar citation on the 28th of December, 1903, on which last-named date the court, after hearing evidence thereon, ordered that said application be denied. On January 7, 1904, the defendant filed his application for a change of venue on the ground of the prejudice of the inhabitants of the county, which application, after hearing the evidence thereon, was by the court overruled, and the cause set for trial February 23, 1904. On February 8th, the order that a *venire* for a jury issue was made, which is here complained of.

There was no merit in appellant's motion to quash or the challenge to the array of jurors as returned by the sheriff. It is sufficient to say upon this proposition that if the term *trial* as used in section 2610 supra, means an adjudication of the case upon its merits, which is suggested by counsel for appellant in their reply brief, then the order of the court authorizing the sheriff to summon a jury to be present at some subsequent date fixed for the trial of the cause, was a mere administrative function performed by the court preparatory to the trial and in no sense a part of the trial of, the cause, and the presence of the defendant was in no way essential to the valid exercise of such function, nor to the validity of the order so made.

It may be said, as was ruled in Osborn v. State, 24 Ark. 629, that the phrase, *during the trial,* means every substantive step taken by the court in the cause, after the indictment is presented by the grand jury to the court, up to and including the final judgment; yet it is apparent that each step taken in the cause does not constitute a separate and distinct trial; but is only a step and part of the prosecution, which, together with

the final adjudication of the case upon its merits, constitutes the trial contemplated by the statute.

In the first place, the order for the jury complained of, in our opinion, does not constitute such substantive step in the cause as renders it a part of the trial and makes the presence of the defendant essential.

In the second place, if it is to be considered as a part of the trial, then the arraignment and plea of not guilty must also be treated as a part of it, and the record, prior to this order for a jury, disclosing that defendant was present at the time of the arraignment and in the absence of all evidence to the contrary, in accordance with the express provisions of the statute, he is presumed to have been present during the whole trial.

In State v. Montgomery, 63 Mo. 1. c. 299, it was said by this court that the arraignment and the prisoner's plea must be the first step in the progress of the trial. Aside from all this, upon the return of the panel of jurors as ordered by the court, defendant was afforded ample opportunity to present any and all objections to the manner and method of summoning such jurors and to any improper conduct on the part of the officers in summoning them, as well as any other complaint he desired to urge against the array; however, he simply contented himself with a motion to quash and a challenge to the array, on the simple ground that he was not present at the time the order that a *venire* issue was made. As to that, as heretofore stated, there was no evidence to support it, and it was without merit, and the record does not disclose any harm or injury done the defendant.

V. Appellant complains of remarks of the assisting prosecuting attorney in his opening argument to the jury. The language used by the counsel for the State and now complained of as reversible error was as follows: "In all candor and with due reverence, I wish to confess to you that during the progress of this trial,

my conception of the devil has been materially changed. And if I were to portray him to you now, I would not paint him as hoofed and horned, lurid with purgatorial fires, but rather would I picture him to you as arrayed in white vest and Prince Albert coat, with a voice as soft as the breath of summer, and with a steel gray eye.'' At the same time said attorney pointed with his hand across the counsel table towards the defendant, who sat there, dressed in a white vest and Prince Albert coat. The court 'thereupon immediately said to Mr. Gardner, in the presence and hearing of the jury: ''Mr. Gardner, that is not proper argument.''

The State is best represented by counsel who confines himself to a discussion of the facts of the case developed at the trial, and this court has repeatedly condemned personal abuse of the defendant upon trial. We confess that the remarks of counsel, even though clothed in choice and select terms, would have been better left unsaid; however, the trial court very promptly rebuked him and said in the presence of the jury, calling the counsel by name, that it was improper argument; and we are of the opinion that the language used was not of that low order of abuse and denunciation of defendant indicated in the decisions which this court has held prejudicial error. This being true, and the court having promptly rebuked counsel, in our opinion, such remarks should not be held as reversible error.

It is also complained that the counsel for the State, in his argument to the jury, referred to the defendant's conduct as showing ''reptilian sagacity.'' There was no error in these remarks. They amounted to nothing more, except in a different form, than saying, as suggested by the Attorney-General, that the defendant, in explaining the damaging circumstances shown against him, was as ''wise as a serpent.'' The court also very promptly rebuked counsel for even making these remarks and emphatically told counsel in the presence

and hearing of the jury that it was improper and that he must not repeat such language. This was not such personal abuse of the defendant as indicated in the cases cited in the brief of counsel as would warrant this court in reversing the judgment.

VI. Appellant assigns as error in his motion for a new trial the misconduct of one of the jurors. In support of this assignment, the affidavit of Jno. R. Bennett was filed, in which the affiant states that during a recess in the trial of said cause, one of the jurors, who was in the jury room on the second floor of the court house, leaned out of the window of said room and talked to some man on the sidewalk in the court house yard.

Upon this assignment of error it will suffice to say that the record fails to disclose at what time the knowledge of such misconduct complained of came to appellant or his counsel. This is fatal to the contention urged by appellant upon this proposition. In 12 Ency. Plead. and Practice, page 558, the rule of practice upon this subject is thus announced: "When a party moves for a new trial on the ground of misconduct which occurred during the trial, he must aver and show affirmatively that both he and his counsel were ignorant of the misconduct charged until after the trial."

In support of the rule above announced we have the case of State v. Robinson, 117 Mo. 649. It was there said by SHERWOOD, J., speaking for this court, that "where misbehavior of a juror is charged as having occurred during the trial, it must affirmatively appear that the party complaining thereof did not know of the fact before the jury retired to consider of their verdict. [2 Thompson on Trials, sec. 2620, and cases cited.] This material fact is not disclosed in the affidavit filed, and the statement of it in the motion for a new trial is no evidence of its existence, as all our authorities show. If the complaining party knew during the trial of such misbehavior, it was his duty to call

immediate attention of the court to it, and not take his chances of a reversal based on such ground.''

It was ruled in State v. Hunt, 141 Mo. 626, involving a similar principle to the subject now under discussion, that it was essential that the defendant and his counsel also make affidavit as to the facts alleged, in respect to the misconduct of jurymen, which is made the basis of one of the grounds for a motion for new trial. To the same effect is State v. Howard, 118 Mo. 127; State v. Burns, 85 Mo. 47.

VII. There is no merit whatever in the complaint of appellant to the action of the trial court in overruling defendant's plea in abatement. This plea in abatement was based upon the same ground of failure to endorse the names of witnesses, as had been previously alleged as a ground in the motion to quash the indictment; the difference being that in the motion to quash there was a prayer that the indictment be quashed for such failure, and in the plea in abatement there was no prayer at all. Upon the motion to quash the indictment for the same reason alleged in the plea in abatement, the court heard the testimony as introduced by the defendant and overruled the motion.

We have heretofore fully discussed that proposition, and are of the opinion that the grounds alleged cannot be made the basis of a plea in abatement. There was no issue of fact as contemplated by the statute, to be submitted to a jury. Even if the facts as alleged in the plea in abatement were true, it does not necessarily follow that the indictment would be abated. The facts in contemplation of law which are to be submitted to a jury upon the trial of a plea in abatement, are such a state of facts, if found to exist, that the court must, by a proper order, abate the indictment. The ground as alleged in the plea in abatement was that the prosecuting attorney at the time of the return of the indictment and prior thereto, had knowledge of the names of ma-

terial witnesses, which he intentionally refrained from endorsing on the indictment for the purpose of springing such witnesses at the trial as a surprise on the defendant, etc. As before stated, that question was fully heard upon the motion to quash — but for the purposes of this case, concede that to be true, then it was a question for the court to determine whether or not the indictment should be quashed or the prosecuting attorney required to endorse the names of such witnesses upon the indictment and give the defendant a reasonable time in which to prepare for his trial with such new witnesses so endorsed. In addition to this, it will be observed that section 2517, Revised Statutes 1899, does not in terms impose the duty of making the endorsement of witnesses upon the indictment upon the prosecuting attorney. It is simply provided that upon the finding of an indictment by the grand jury, the names of the material witnesses must be endorsed. While this duty is ordinarily performed by the prosecuting attorney, it is not done by any command of the statute and as the grand jury are required to have the witnesses before them, hear the evidence and predicate their finding upon it, the presumption is that they know better than any one else the material witnesses upon whose testimony they based their action; it is, therefore, clearly within the reasonable contemplation of section 2517 that they make the endorsements of the witnesses or that it be done under their direction. The correctness of the conclusions herein reached, that this plea in abatement did not present any issue of fact which should be submitted to a jury, is emphasized by the action of the learned counsel for appellant in submitting it to the court without any request for a jury. The court had passed upon the same facts upon the motion to quash the indictment. This plea in abatement was submitted upon the same facts as offered in evidence upon the motion to quash, and it is apparent that counsel did not regard it as a question to be submitted to the

jury, otherwise they would have made such request of the court. The action of the court in overruling this plea in abatement was proper and upon this assignment of error the ruling must be adverse to appellant.

VIII. Appellant complains at the action of the trial court in giving instruction numbered 8, authorizing the conviction of the defendant if the jury found that he killed McCann in the perpetration of a robbery.

It will be noted that the indictment in this cause contains five counts, charging the homicide in different forms; the first charged murder by shooting, the second murder by drowning, the third murder by shooting and drowning, the fourth murder by unknown means, and the fifth murder in the perpetration of a robbery. Before the jury was sworn the prosecuting attorney, with the permission of the court, entered a *nolle prosequi* as to the fifth count of the indictment, and the fourth count was taken from the jury by an appropriate instruction.

Counsel for appellant frankly concede in their brief that under the first, second or third counts, if they are good, it would be competent to prove a murder by robbery, if a special count had not been added. However, the contention is urged that the adding of the special count, charging murder in the perpetration of a robbery, and the dismissal of it by the State, was an abandonment of that feature of the case that the murder was committed in the perpetration of a robbery; hence, no proof should have been admitted along that line, and it was error to submit that feature of the case upon the instruction.

It is only necessary to state upon this proposition that when the State dismissed the fifth count in the indictment, the case presented was then one simply as though no such count had ever been presented in the indictment. This being true, the State had the right under the remaining counts upon which the defendant was tried, to introduce proof of the commission of the

offense in the perpetration of a robbery, and the court very properly gave instruction number 8, which is here complained of. The action of the court in giving this instruction finds ample support in State v. Meyers, 99 Mo. 107; State v. Foster, 136 Mo. 653; Kelley's Criminal Law and Practice, page 321.

IX. Appellant insists that the court committed error in excluding the evidence of witness Clifton R. Wooldridge. It was sought to elicit from this witness testimony which tended to prove that the matrimonial bureau of Mrs. McCann in St. Louis was but a continuation of a similar illicit and fraudulent business which she and McCann had together engaged in in Chicago, and on account of which business the alleged deceased had many enemies, some of whom wrote him letters threatening personal violence. Defendant further sought to show by this witness that McCann was engaged in a fraudulent turf business in Chicago and a get-rich-quick scheme by which he made many enemies and that the deceased was a man who had borne many names and was connected with many frauds and thereby made many enemies who threatened him injury. This testimony was excluded by the court and we are of the opinion properly so. It had no tendency to prove or disprove any of the issues involved in this case.

In State v. Crawford, 99 Mo. 74, defendant was charged upon indictment with the offense of arson. The testimony upon which the judgment of conviction rested in that case was largely curcumstantial, and the defendant there, as the defendant in this cause, offered to show that threats had been made against the person and property of the prosecuting witness. This court, speaking through Sherwood, J., said upon the subject of the admissibility of such testimony that "there was no error committed in refusing to allow evidence to be adduced for the purpose of showing whether one Hogg had not made threats against the person and property

198 Sup—7

of witness, whose store-house was burned. Such threats were wholly foreign to the case—*res inter alios*—and consequently had no bearing on the guilt of the accused. [Best's Evid. (Chamberlayne), 489; Starkie, Ev. (9 Ed.), pp. 36, 61, 82, et seq.]''

To the same effect is State v. Taylor, 136 Mo. 66. The defendant in that case was charged with burglary and larcency, and this court, upon the proposition of the admissibility of evidence of a similar character to that sought to be elicited from witness Wooldridge, said that ''the offer of defendant to prove that Jim Baker, the blacksmith, had made a key which would fit and unlock the store in question, and that he intended to burglarize it, was properly rejected. Mere threats by third persons to commit the crime charged against the accused, or the confessions of such persons in open court that they had committed such crime, is wholly inadmissible in defense of the party on trial, because such matters are purely hearsay.'' [Citing State v. Duncan, 6 Ired. 236; State v. May, 4 Dev. 332, et seq; State v. Patrick, 3 Jones (N. C.) Law 443.]

The rule as announced upon this proposition by this court has full support by similar rulings in courts of high standing in other States. In Crookham v. State, 5 W. Va. 510, it was ruled that prior threats to kill and subsequent immediate flight of a third person were properly excluded as not pertinent. In Buel v. State, 104 Wis. 132, it was also held that threats of third persons to kill the deceased were incompetent. In State v. D'Angelo, 9 La. Ann. 46, it was held that testimony showing that deceased had innumerable enemies was incompetent on the ground that it was too vague and uncertain.

X. Appellant very earnestly insists that the court committed error in the admission of Asa Mitchell's testimony and the copy of the letter as identified by the witness.

Mitchell at the trial testified that the defendant on the 22nd of June, 1903, which was three or four days after it is alleged that the defendant killed McCann, came to his office in the Mermod-Jaccard building, in the morning about 10:30, and detailed a difficulty that McCann had gotten into out at the Suburban Garden, and stated that McCann was in such a condition that he didn't dare go home, and that McCann was in a house on Chestnut street and would return in a day or so, as soon as his face got better, and that the defendant expressed the wish to him that some one would write a letter to him to show to Mrs. McCann so that she wouldn't worry so much. The witness suggested that he would write a letter, and when this suggestion was made the defendant sat down and wrote a letter in lead pencil and Mitchell copied it in pen and ink. The letter was as follows:

"June 22, 1903.

"Fred: Can't return just yet, am in safe hands and getting better. Never mind sending what I asked you, have enough for present needs. Take care of Jessie and don't let her worry. Look after the house and do all I told you to do. Keep your promise and I will keep mine.

"E. M. for Jim."

After some inquiry about envelopes, the letter as written by Mitchell was handed to the defendant, and the testimony tended to show that the defendant took it to the telegraph office and directed that it be addressed and sent to him at the Leland Hotel by a messenger. The letter was received at the hotel and read by Mrs. McCann, and delivered by her to Chief Desmond. Desmond, in securing a statement from Mitchell, made a copy of the letter, and gave the original letter to Detective Kiely, who delivered the same to Sheriff Hencken. The loss or destruction of the original letter given to Hencken, in whose custody it was placed, was sufficiently shown. The copy of the letter as made

State v. Barrington.

by Desmond was shown to witness Mitchell and he stated positively that it was an exact copy of the letter that he wrote and handed to the defendant in the Mermod-Jaccard building. We think it is clear upon this showing that, after sufficient proof of the loss or destruction of the letter written by Mitchell at the suggestion of the defendant had been introduced, the State had the right to prove the contents of that letter; and it can make no difference whether such contents are proven by the mere statements of the witness as to what the letter contained or by the introduction of a copy of the letter which is identified by the witness, as in this case, as being an exact copy of the letter the contents of which are sought to be proven. Either mode of proof of the contents of the lost letter is but secondary evidence, and we can see no valid objection, the witness fully identifying the copy of the letter, to its being read in evidence. To illustrate this proposition: supposing there was no copy of the letter and it was lost or destroyed, and the witness while on the stand, after proper proof of the loss of the instrument, instead of merely stating what the contents of the letter were, should take a pencil or pen and ink and reduce to writing its contents and then read it to the jury, and say, these are the contents of the letter, would it for a moment be held that the mere reducing the contents of the letter to writing by the witness and reading it to the jury would be anything different from the proving of the contents in the original way? We think not. The rule is announced by some of the authors on the subject of evidence that the party offering to prove the contents of an unavailable written document must offer a copy, if he has one in his control, in preference to recollection testimony. [2 Wigmore on Evidence, 1538.] But aside from all this we are unable to comprehend how the defendant is in a position to complain about this letter when the record discloses that in his own testimony he practically identifies it himself.    Upon

this subject the defendant in substance stated: ''Mitchell was my friend, and Mrs. McCann I saw was grieving. I was sorry to see her, and I told Mitchell about it and he says I guess we can fix it up and suggested to write this letter, as he has voluntarily stated, and I consented to it for the simple reason I couldn't bear to see that woman fretting, and I expected him to return home in a few days.''

It will be observed that the copy of the letter had been introduced by the State and that the defendant in his testimony refers to it as ''this letter,'' and that he consented to it for the simple reason that he could not bear to see the woman fretting. This testimony was clearly competent and relevant in this cause, and very damaging to the defendant by reason of its strong tendency towards establishing the fact that he was endeavoring to conceal the offense for which he was afterwards arrested, tried and convicted.

XI. There is no merit in assignments of error under paragraph 11 and 12 of appellant's brief. They simply complain of the weeping of Mrs. McCann during the argument of the case, and the excluding of the subpoenas of witnesses before the grand jury on the hearing of the motion to quash the indictment and plea in abatement. We shall not burden this opinion with any discussion of these propositions.

XII. Appellant complains of instruction numbered 7 given by the court. It is sufficient to state upon this complaint that the instruction challenged has repeatedly met the approval of this court.

In State v. Thomas, 78 Mo. 327, this instruction was given and in commenting upon the instruction this court said: ''The instructions, prepared by the court of its own motion, are exceptionally good.'' In the recent case of State v. Cushenberry, 157 Mo. 168, it was again given by the trial court and expressly approved by this court.

The appellant, however, complains that the terms "Without just cause or provocation" being used in the instruction, should have been defined. There was no necessity for such definition. The court in defining deliberation in instruction number 6, which fully stated the character and nature of a provocation which would reduce the killing from murder in the first degree, said that "any such provocation by improper conduct of the deceased towards the defendant of such a nature as to cause the defendant to be so far under the dominion of sudden passion in consequence thereof, as to be unable to judge rightly as to the nature, quality and consequence of his acts, or to materially impede or interfere with such judgment, would take away deliberation and prevent a cool state of the blood." This clearly was a sufficient defining of the term provocation.

2. Appellant also complains of instruction number 6 defining deliberation. This instruction was as follows:

"Deliberation means done in a cool state of the blood, not in sudden passion, engendered by some just or reasonable cause of provocation. It does not mean brooded over or reflected upon for a week or a day or an hour; but it means an intent to kill executed by the defendant in a cool state of the blood, in furtherance of a formed design to gratify a feeling of revenge or to accomplish some other unlawful purpose, and not under a violent passion suddenly aroused by some provocation. Any such provocation by improper conduct of the deceased towards the defendant of such a nature as to cause the defendant to be so far under the dominion of sudden passion in consequence thereof, as to be unable to judge rightly as to the nature, quality and consequences of his acts, or to materially impede or interfere with such judgment, would take away deliberation and prevent a cool state of the blood."

The complaint as to this instruction is practically directed to the failure of the court to define improper

conduct. Impropr conduct has no technical meaning, and if there is any criticism of this instruction it is because it is too favorable to the defendant in using the broad language of improper conduct. Moreover, we might stop to inquire as to what reason the appellant has to complain of the failure of the court to instruct upon the subject of provocation or as to what would constitute provocation, or its failure to define heat of passion or improper conduct. The defendant makes no claim that he killed McCann by reason of any provocation, or that he was in the heat of passion at the time he killed him. His defense is absolutely that he did not kill him at all. While it may be true that, if the testimony as introduced by the State indicated such a state of facts surrounding the transaction as would tend to show that the killing was done in a heat of passion by reason of improper conduct on the part of the deceased, the court should instruct upon murder in the second degree or manslaughter in the fourth degree, even though the defendant might deny absolutely that he did the killing, yet the record in this case does not disclose any such state of facts, and we are of the opinion, guided by the disclosures of the record, that this was murder of the first degree or it was nothing.

3. Instruction number 14 is complained of, which is as follows:

"If you believe and find from the evidence that it fails to show any motive on the part of the defendant to commit the crime charged against him, then this is a circumstance in favor of his innocence which you ought to consider in connection with all the other evidence in making up your verdict. And in order to ascertain a motive you should take into consideration all the evidence in reference to the associations and relations between the said James P. McCann and the defendant, and their deportment toward each other, together with their surroundings and all other evidence in the case. But if, upon consideration of all the evi-

dence, you believe and find that the defendant has committed the crime charged, then you should find him guilty, no matter whether any motive for the deed be apparent or not.''

In treating this complaint it is sufficient to repeat what was said in case of State v. David, 131 Mo. l. c. 397, namely: ''The motives for crime are so numerous, so hidden, and often so utterly unreasonable, that it is impracticable to require that they shall always be made manifest.'' The instruction complained of is substantially in the form as given in State v. David, supra, and State v. Henderson, 186 Mo. 473, and was expressly approved by this court.

4. Instruction number 15, complained of, is one that has repeatedly been in judgment before this court.

It undertook to direct the jury in respect to the consideration of statements made by the defendant prior to his arrest. It is unnecessary to discuss this instruction or to reproduce it in this case. It is sufficient to say as to this instruction that it has been approved by a uniform and unbroken line of discisions by this court. [State v. Coats, 174 Mo. l. c. 416; State v. Howell, 117 Mo. 323; State v. Duestrow, 137 Mo. 44; State v. Talbott, 73 Mo. 347; State v. Hollenscheit, 61 Mo. 302, and numerous other cases.]

5. Appellant complains of instruction number 5, which substantially told the jury that if the defendant killed McCann without deliberation it was second degree murder. The complaint to this instruction is directed to the failure of the court to define the ''other'' kinds of murder in the second degree than that in the heat of passion, and that the court failed to fix the maximum punishment for such offense; that is, that, if found guilty, his punishment should be assessed at imprisonment in the state penitentiary for a term of not less than ten years or for his natural life. The minimum punishment was fixed by the instruction complained of but the maximum was not.

What has heretofore been said in respect to the instruction on murder in the second degree makes it manifest that this complaint is without merit.

6. Counsel for appellant challenge the correctness of instruction number 3, which is as follows:

"If you believe and find from the evidence that the defendant, Frederick Seymour Barrington, at the county of St. Louis and State of Missouri, on or about the 18th day of June, 1903, at a time prior to the second day of October, 1903 (being the date of the filing of the indictment herein), feloniously, willfully, deliberately, premeditatedly, and of his malice aforethought forcibly and violently made an assault with his hands and arms upon the said James P. McCann and then and there feloniously, willfully, deliberately, premeditatedly and of his malice aforethought with his said hands and arms pushed, threw and cast the said James P. McCann into a pond there situated, in which there was a great quantity of water, and by means of such casting, throwing and pushing the said James P. McCann into said pond of water the said defendant, Frederick Seymour Barrington, feloniously, willfully, deliberately, premeditatedly, and of his malice aforethought then and there caused the said James P. McCann to be choked, suffocated and strangled and drowned, and that by reason of said choking, suffocating, strangling and drowning the said James P. McCann then and there prior to the said 2nd day of October, 1903, died, then you will find the defendant guilty of murder in the first degree, and so state in your verdict."

The challenge to the correctness of this instruction is based upon the contention that it fails to state that the pushing into the pond was with a design to effect death. This was neither necessary in the indictment nor the instructions. The instruction requires the jury to find every essential element in the commission of the act which resulted in McCann's death, and it is no-

where contended that the instruction does not contain all of such elements. The instruction makes it incumbent upon the jury to find that the defendant feloniously, willfully, deliberately, premeditatedly and of his malice aforethought with his hands and arms pushed, threw and cast the said James P. McCann into the pond there situated; then follows the charge that by reason of such willful, premeditated and malicious act McCann was choked, suffocated and strangled and drowned, from which he died. There was no necessity for requiring the jury to find that he designed by the commission of such acts to kill McCann, for the reason that when the acts are alleged to have been committed which resulted in his death, the legal presumption follows that he intended the consequences of such acts, and in the absence of any testimony indicating that he did not design his death, the jury would be fully authorized in indulging the presumption from the commission of the act, that he intended to kill him by the means employed. There was no error in this instruction.

XIII. It is urged that the court committed error by refusing instructions numbered 1 and 2 requested by defendant at the close of the testimony. Instruction numbered 1 covered the subject of circumstantial evidence and directed the jury as to the essential requisites of the showing upon that character of evidence which would authorize a conviction. Number 2 was upon reasonable doubt of the defendant's guilt.

We have carefully considered the instructions given by the court upon the testimony elicited in this cause, and it is manifest that instructions numbered 11 and 12 fully covered the law upon the subjects to which the refused instructions had reference. The directions of the court in the instructions covering those subjects stated the law fairly, clearly and fully as favorable to the defendant as the law warrants. The law

upon those subjects having been fully covered by appropriate instructions given by the court, there was no error in refusing the instructions requested by the appellant. [State v. Franke, 159 Mo. 535; State v. Nelson, 166 Mo. 191; State v. Bradford, 156 Mo. 91.]

XIV. Appellant challenges the sufficiency of the first, second and third counts of the indictment. It will suffice to say that the first count of the indictment is not subject to the criticism indulged by the appellant, that is, that it fails to charge an assault. An examination of that count demonstrates that the assault is charged in the form that has been repeatedly approved by this court.

The challenge to the sufficiency of the second count of the indictment is predicated upon the same objection urged to instruction numbered 3, that is, that the indictment fails to allege that McCann was pushed into the pond with a design to effect death. Upon this subject we have examined the precedents of that eminent author, Mr. Wharton, and find that this count in the indictment complained of is in harmony with and substantially the same form as his precedents in charging an offense of this character. [1 Wharton's Precedents of Indictments and Pleas, top page 123.] This count of the indictment contains the allegation of every essential element necessary to constitute the offense, and it is manifest that there is no necessity to allege in the terms suggested by appellant, that the design in casting or pushing McCann into the pond was to effect death. The intention and design to effect death are clearly embraced in the allegations charging the offense. An analysis of the charge shows that it is substantially alleged that he feloniously, willfully, deliberately, premeditatedly and with malice aforethought committed certain acts which resulted in the death of McCann and that is followed in the concluding portion of the charge that the defendant in the manner and

by the means aforesaid feloniously, willfully, deliberately, premeditatedly and of his malice aforethought did kill and murder. The language employed clearly charges an intentional killing in the manner and by the means as charged in the indictment. We have no hesitancy in saying that this count in the indictment, following the precedent of Mr. Wharton, correctly charged the offense.

The third count of the indictment is challenged on two grounds, first, that it is defective for the reason that it charges proximate causes of death. Again we have consulted Mr. Wharton's Precedents, and find that this count in the indictment is in perfect accord and harmony with them. Second, it is insisted that this count in the indictment is vague, indefinite and uncertain, on the ground that it is first charged that the assault was made and the wound inflicted with a "revolving pistol," followed by reference to the infliction of such wounds as being "gun shot wounds."

From an examination of this count in the indictment it will be observed that it first charged in due form the infliction of certain wounds by a revolving pistol, and then follows the charge that at the same time and place the defendant "did then and there immediately after the giving and inflicting of the said gun shot wounds in the manner and form aforesaid, and at the time and place aforesaid in and upon the body of the said James P. McCann, did then and there," etc., following with the detailed charge of pushing and casting him into the pond of water, etc. It is apparent from the terms used in this charge that the use of the terms "gun shot wounds" could have reference to no other wounds except those which had been previously charged to have been inflicted by a revolving pistol; for it expressly avers the gun shot wounds were inflicted in the manner and form aforesaid, and at the time and place aforesaid. The only wounds previously alleged were those inflicted with the revolving pistol, and the

time and place of their infliction were alleged; hence it is manifest that the gun shot wounds referred to could only relate to the wounds inflicted by the revolving pistol. As suggested by the learned counsel representing the State in this cause, "the word 'gun' is a generic term and includes the word 'pistol.' It is defined in Webster's dictionary as meaning 'any firearm for throwing projectiles by the explosion of gunpowder, etc.' In common usage the word 'pistol' and 'gun' are used interchangeably, and as the averment was 'after the giving and inflicting the said gun shot wounds in the manner and form aforesaid and at the time and place aforesaid,' etc., it would seem that it was not open to the objection that it was 'vague, indefinite, uncertain and argumentative.' "

XV. It is insisted by appellant that the court committed error in the admission of the statements and admission of defendant while under arrest. Upon this proposition the record discloses that the jury was excluded and many witnesses heard by the court in laying the proper foundation for the introduction of such statements. The court heard this testimony and determined that the statements were voluntary, hence admitted them. With the exception of the testimony of the defendant the evidence tended strongly to show that there were no promises or threats made as an inducement to making the statements offered in evidence. The mere fact that the defendant was in charge of an officer does not render any statements that he may make inadmissible, if it appears that they were not induced by threats or promises of reward or the hope thereof; nor does the fact that the statements of the defendant were elicited by questions put to him by an officer or private persons render them inadmissible, nor is it any sufficient ground of objection that the questions propounded to the defendant by those seeking a statement from him assumed his guilt, or that he was not warned

that his statements would be used against him. [Kelley's Crim. Law, pp. 180-181; State v. Jones, 54 Mo. 478; State v. Phelps, 74 Mo. 128; State v. Northway, 164 Mo. 513; State v. McClain, 137 Mo. 307; State v. Rush, 95 Mo. 199; State v. Guy, 69 Mo. 430; State v. Shackelford, 148 Mo. 493.]

XVI. Mrs. McCann, the widow of the deceased, was called as a witness and in seeking to have this witness identify the coat that had been found as that deceased had on the night it is charged he was killed, a pair of trousers or pants was exhibited to the witness and she testified that they were those of Mr. McCann and that the coat that he had on the night it is alleged he was killed was of a similar material.

It is contended by appellant that the exhibition of those trousers to the witness on the stand constitutes reversible error. To this contention we cannot give our assent. The trousers were not introduced in evidence and there was no pretense that the deceased had on those trousers the night he is charged to have been killed, and they were simply shown to the witness, being the trousers of the deceased, as an aid in describing the material of which the coat that he did have on was made. Before the pants were shown to the witness she had described the coat in a general way and when the coat was exhibited to her she swore that that was the same coat McCann wore away at the time of his disappearance. It is but common experience in the trial of cases in courts that articles are frequently described by reference to some other article of similar character; for instance, it frequently occurs that a witness who is testifying and a description of clothing or other article is sought, and he says, "I had on a coat like or similar to the one the gentleman sitting over there has on," or pointing to some other article in the court room, states that the article he is undertaking to describe was somewhat like that, or in describing a

knife, that is not before the court and jury, he takes a knife out of his pocket and says, "It was a knife similar to this one." It will certainly not be seriously contended that testimony given in that manner would be reversible error. The reference to the trousers by Mrs. McCann was not different to the ordinary and usual way of identifying articles, as above illustrated. There was no error in such examination of this witness, and we are unable to possibly conceive how the mere fact of exhibiting the trousers to this witness, in the manner in which it was done, could in any possible way harm the defendant. She had previously described the coat, and afterwards fully identified it. The trousers were not introduced in evidence and even though it be conceded that their exhibition before the jury was immaterial and incompetent, still we repeat that it could in no way have had any influence upon the jury in returning their verdict. In addition to this the court instructed the jury not to consider it. Upon this proposition counsel direct our attention to the cases of State v. Thomas, 99 Mo. 235, and State v. Goddard, 162 Mo. 227. A careful analysis of those cases will clearly demonstrate that they are not parallel cases with the case at bar, upon the question presented.

We are of the opinion that in any view to be taken of the examination of Mrs. McCann in respect to the trousers there was no error committed by the trial court which would authorize the reversal of this judgment.

XVII. Appellant complains at the admission of certain property identified as that of McCann, the deceased. While upon this question it may be said that the identification by some of the witnesses was not absolutely positive and clear, yet it must be remembered that upon the question of identification the opinion or belief of witnesses as to the identity of persons or things, when such opinion or belief rests upon facts

within the witness's own knowledge, is competent evidence, although the witness will not testify positively to such identity; and testimony of this character is at least a sufficient foundation for the exhibition of the articles to the jury. [State v. Cushenberry, 157 Mo. 168; State v. Howard, 118 Mo. 127; State v. Hopkirk, 84 Mo. 278; State v. Babb, 76 Mo. 501.]

The exhibition of the articles which had been sufficiently identified to the jury does not mean that the jury must accept it as conclusive evidence that those were the articles of McCann, but they simply hear the testimony and then upon their final consideration determine for themselves as to whether the testimony of the witnesses was sufficient to authorize them to find the ultimate fact, that the articles exhibited were in fact the property of McCann. There was no error in the admission of this testimony.

XVIII. The court properly excluded the evidence offered by defendant as to the custom of police officers in examining and searching prisoners. Evidence had been offered by the State as to the examination and search of the defendant, and the only purpose of this evidence was to affect the credibility of the witnesses on the part of the State testifying to such search and examination. We know of no rule which would permit a witness to be impeached or his credibility assailed in this sort of a way. The question presented was as to how the examination and search of the defendant was made, and a full opportunity was afforded defendant to show that it was not made in the manner testified to by the witnesses, and as well the right of cross-examination of such witnesses with a view of ascertaining whether or not they in fact made the search and examination in the manner as testified to by them. The testimony was properly excluded.

XIX. This leads us to the final contentions of the appellant, that is, that the *corpus delicti* was not

State v. Barrington.

sufficiently established; that the court erred in submitting the question of murder in the first degree to the jury, and that the verdict of the jury was the result of bias, passion and prejudice, and is contrary to the weight of the evidence as well as the law of the case. We will treat these final complaints altogether.

At the very inception of the consideration of the propositions involved in these contentions, it is well to first determine as to what are the essential elements of the body of the crime. The law is nowhere more clearly or correctly stated than in State v. Henderson, 186 Mo. 473. It was there said by this court: "The *corpus delicti* in murder consists of two elements, to-wit, the death of the person alleged to have been murdered, and the criminal agency of some one causing the death. Both of these must be established in a prosecution for murder or the conviction cannot stand. As to the proof of the death of the person alleged to have been murdered, it is quite often stated that at common law the fact of death must be established by direct or positive evidence, but now, by the weight of authority in this country, the fact of death, as well as of criminal agency, may be shown by circumstantial evidence, when that is the best evidence obtainable, and provided always that it is sufficient to produce conviction in the minds of the jury beyond a reasonable doubt."

It is apparent that an intelligent solution of this proposition necessitates at least a brief review of the important facts developed in the trial of this cause. McCann and the defendant left the Leland Hotel on the evening of June 18, 1903; McCann was in usual good health and spirits, telling his wife as he was leaving that he would return in a short while. Both of these parties were observed on the car going to Bonfils after 10 o'clock that night; McCann was talkative and

168 Mo.—8

in good humor during the trip and inquired when the next car went back, saying that he must get back on that car. McCann and defendant left the car about 10:35 p. m. and McCann was last seen alive (by any other person) when leaving the car walking with the defendant along the path leading to the quarry. In a few minutes after they were seen going to the quarry a pistol shot, then a cry and another pistol shot, were heard coming from the direction in which these two men went, and then no further sound is heard. Early the next morning the man who was last seen with McCann, who was the defendant, late the night before, is concededly near the quarry where they were last seen together. The defendant is seen walking back towards the city alone, a distance of twelve miles, notwithstanding the testimony tends to show that he had money in his pocket to pay for riding, and did ride as soon as he reached the city. There is testimony indicating that in walking alone, when the defendant would see a car approaching, there was some effort on his part to prevent his identification. In his possession he is carrying McCann's cane and wearing a hat entirely different from the hat that he wore on going out to Bonfils, and that at least had some resemblance to the hat of the deceased, McCann. The defendant returns to the Leland Hotel, his clothing is wet, muddy and soaked with blood. In a short time after the defendant returned to the city near the pathway he traveled that morning, were found the shoes and a stocking of McCann, worn by him the night of his disappearance, and about three months after that time other clothing and jewelry are found hidden along the route journeyed by defendant on his return from Bonfils Station. Something near a week after McCann had left the Leland Hotel in company with the defendant, going to Bonfils, a corpse is found in the quarry, where the shots and cry were heard; the condition of the body indicated that death had occurred several days before. The body of the

corpse was entirely naked; the thumb had been cut through the tendons, two gashes are found on the cheek and neck just above the throat and in front of the jugular vein, two bullets found within the skull, one of which would have produced a fatal wound. On the bank of the quarry is found a bloody razor handle, some cartridges and McCann's pocketbook. This dead body is fully identified as that of James P. McCann; the evidence of certain witnesses clearly tends to prove that fact. One of the witnesses, B. T. Hume, a brother-in-law, testified that "it was the body of James P. McCann." He said: "I identified it by marks that were on it; a mole on the right of the breast and a scar from a burn below the navel; I learned of the burned spot from what his mother and the family said; I had not seen that for two or three years; I had seen that scar dozens of times altogether; we were boys together; I saw the mole on the breast very often; the mole and the scar that I saw on the body at Sheehan's undertaking establishment were the identical ones that I had seen on McCann in his life time; I didn't see all of the body, some of it was missing; there is no possibility, none on earth, of my being mistaken in that identification." In addition to this there was testimony tending to show that the defendant was seen near the scene of where this murder is charged to have been committed a day or two before. He had said to the Mc-Canns that he had been out in St. Louis county to visit some English friends, saying that McCann and his wife were invited out there; however, it seems that on the evening of the 18th when they went out there there was some mistake and that Mrs. McCann was not invited and she did not go. The day that McCann and the defendant went out to Bonfils defendant told McCann about some pension papers he claimed to have on which he said his English friends would loan him $1,000, and wanted McCann to go with him to get it. After the defendant's return to the Leland Hotel on the morning

of the 19th of June, he made many false and contra-
dictory statements as to where he. and McCann went
on the night of the 18th of June, and he persisted in
the truth of those statements until compelled to aban-
don them because of his identification by the railroad
men.   He undertook to exercise upon his return acts
of proprietorship over the hotel and required one of
the boarders, Leonard, to leave.   There was also a
constant refusal to investigate McCann's disappear-
ance, and he refused to go to the place where he said
the trouble occurred, and made suggestions to Mrs.
McCann of the unfaithfulness of her husband; finally
he told her that he had seen McCann three times since
his disappearance, and would offer to take her and her
sister to where he was if they would agree not to insist
on seeing him.   It further appears in evidence that,
after the discovery of the corpse out at the quarry and
before defendant's arrest, he sent his trunk to the
Union Station and instructed the expressman not to
tell where he got it.   In addition to this, after the
return to the city from Bonfils, was the testimony tend-
ing to show that he collected $164 won by McCann on
the races, the check for which McCann had in his pos-
session when he and the defendant left on the evening
of the 18th for Bonfils.   There were many other dam-
aging circumstances introduced in evidence against
the defendant tending to show his cunning and plans
in his efforts to conceal the fact that anything had hap-
pened to McCann.   All of these convincing circum-
stances pointing to the guilt of defendant, if suscepti-
ble of explanation, so far as the record discloses, were
practically left unexplained, except in some particulars
by the testimony of the defendant himself.   There was
in addition the circumstance introduced by the State
of the finding of certain property of McCann on the
mud board of the wagon in which the defendant had
been conveyed to the police station, and while this cir-
cumstance is weakened perhaps by reason of the former

search and examination of the defendant and the property not found upon him, and the opportunity of other parties to place such property on this board, yet when considered in connection with all the circumstances detailed in this case, it still remains a circumstance which was properly submitted to the jury.

This is an important case, involving the life of a human being, hence we have given careful consideration to the details of the disclosures of the record in this cause. Confronted with the facts as indicated herein, as well as the numerous others disclosed by the record before us, we see no escape from the conclusion that the body of this crime was sufficiently established to fully warrant the jury in the conclusion reached by their verdict. No one can review the details of the circumstances developed upon the trial of this case without being convinced that McCann was murdered, and equally convinced of the criminal agency of this defendant in the commission of that crime. The court and jury had the witnesses before them; the testimony as disclosed by the record indicates most clearly that the dead body found was that of the deceased, McCann, and the circumstances connecting the defendant with the killing of the deceased point unerringly to his guilt.

It may be that by reason of the notoriety attained by the defendant through the press, unfavorable conditions surrounded his case at the time of the trial. That frequently occurs in causes of this character; however, it must not be overlooked that those conditions were created by the defendant, about which he has no legal reason for complaint. He was tried by a court and jury in the county where his offense was committed; his counsel have left nothing undone to the interest of their client which could be accomplished in the honorable practice of their profession, all of which is made manifest by the careful preservation in the record of every unfavorable ruling of the trial court, as well as in the able presentation of this cause in

this court. Whatever results may flow from the conduct and life of this defendant, the responsibility for such results must rest with him.

While this is a case of purely circumstantial evidence, and the circumstances in proof should clearly establish beyond a reasonable doubt the guilt of the accused, yet it must be conceded in this case that the circumstances detailed by the witnesses before the jury were extremely strong and convincing, and unless we are willing to take the advanced step and say that persons cannot be convicted of capital offenses upon circumstantial evidence, then it must logically follow that the appellate courts cannot usurp the province of the jury and determine the facts, and this verdict should not and will not be disturbed on the ground of insufficiency of proof.

Upon the question suggested by counsel for appellant that the court erred in submitting this cause to the jury upon murder in the first degree, it must suffice to say that if there is any force and vitality in circumstantial evidence, then this cause should have either been submitted upon that grade of the offense, or not submitted at all.

We have thus indicated our views upon the numerous assignments of error disclosed by the record and so ably presented by counsel for appellant. Nothing remains except to announce our conclusion, which is, that finding no reversible error in the record before us, the judgment of the trial court should be affirmed, and it is so ordered. *Brace, C. J., Gantt, Burgess* and *Lamm, JJ.,* concur; *Valliant* and *Graves, JJ.,* dissent.

## DISSENTING OPINION.

VALLIANT, J.—There is no country on the face of the earth where the life and liberty of the individual, whatsoever his station, is more highly prized or more sacredly guarded than in this land of ours. When we

read, as we sometimes do, the proceedings of the court in a criminal case of celebrity in some other country, although, if our sympathy happens to be on the side of the prosecution, we may excuse the celerity and promptness with which conviction has been accomplished and say it was well enough since it happened there, yet, however we may applaud the result, we contrast those court proceedings with the orderly proceedings in criminal trials in this country and congratulate ourselves that such proceedings could not occur here, that in our courts the accused are given fairer trials. It sometimes happens that in the strict application by our courts of the rules of law prescribed by the law-making power of the State for the orderly procedure of criminal trials, the community shows impatience at the delay and the result, yet that same community when passion has subsided and it comes to speak its sober second thought through its representatives in the General Assembly would not repeal or alter one feature of that law which was aimed only at securing to the accused a fair trial. The milestones along the path of the progress of civilization are in no respect more clearly marked than in the changes that have been made, as enlightment has come into the minds of our lawmakers, in regard to the treatment of men arraigned before the bar of justice to answer for crimes. It has not been a great while, measuring time by the life of the nation, since a defendant in a criminal case in England was not allowed to have the aid of counsel learned in the law, but he had to depend for what aid in that way he might get, upon the impartiality of the judge who tried the case or the mercy of the counsel who prosecuted in behalf of the crown, and beyond that court there was no appeal. But that law has never been our law since this has been a free country, and although our people in a time of excitement may declaim against our law as it is, yet after awhile the excitement passes away and no voice is heard in the

halls of the Legislature demanding a return to the laws
of those ancient days when the life and liberty of a
man were esteemed of little value. But if those who
are appointed to administer laws that are designed to
give every man a fair trial, are themselves subjected
to the influence of an excited community, it is some-
times impossible for them, however honest and con-
scientious they may be, to resist that influence, and the
result is that unconsciously their judgment is biased.
Our law recognizes the liability of that condition and
by providing for a change of venue it has humanely and
wisely made provision to guard against it and to secure
to the accused even in spite of such condition a fair
trial. From the other side of the ocean occasionally
comes a reproach that we are addicted to mobs and
lynching, but, admitting that we do sometimes have
mobs and that they are lawless and barbarous, inflict-
ing the swift and cruel vengeance of an intensely ex-
cited community, still it cannot be said of them that
while pretending to give the man a fair trial accord-
ing to law, they disregard plain rules prescribed for
his especial protection. If law is to be violated and
wrong is to be done, it is better that it be done by a
lawless mob than by a tribunal created and commis-
sioned to administer justice according to law.

There are many reasons why in my opinion this
judgment should not be affirmed, and those reasons all
combine to establish one proposition, that is, that this
man did not have a fair trial. Every step in the case
from his arrest to his trial was attended with dramatic
scenes that evinced no care to guard from unjust im-
putation the man who, howsoever unsavory his reputa-
tion and howsoever strongly involved in apparently in-
criminating circumstances, might in fact still be in-
nocent and who was in law presumed to be innocent.

It is not my intention to undertake to state in de-
tail the facts on which this prosecution was based, but
briefly I will say that in June, 1903, one James Mc-

Cann, who had been sojourning in St. Louis a short while, disappeared; a few days after his disappearance a dead body was found in St. Louis county bearing evidence of death by violence; there was evidence tending to identify it as the body of McCann, and there was also circumstantial evidence tending to show that the defendant was the man who had committed the deed. The defendant had been, for some months before that, very much in the public mind in a very unfavorable light. It was said of him that he had falsely pretended to be an English Lord, under which pretense he had married a young woman here; his false character was exposed, he was convicted of some offense, not very clearly stated in this record, and sentenced to the city Work House, was pardoned by the mayor, and was immediately employed by a saloon-keeper in the city, who gave his concern the name of "The Lord Barrington Saloon." McCann was a sporting man, interested especially in race-horses; instead of sharing in the general unfavorable estimation of the supposed English Lord he seems to have been attracted to him by his notoriety, sought his acquaintance by visiting him at the saloon which bore his name, and on his first meeting expressed admiration and friendship for him, gave him $50 as a token of his esteem, and invited him to live with him at a house he was keeping which he called the Leland Hotel. This circumstance indicates to some extent the kind of man McCann was, and whilst, of course, the character of the man would in no degree be a palliation for the crime, yet it is of some assistance to the triers of the fact who are asked to draw inferences from the circumstances. The only thing that McCann knew of the defendant was what the daily press which held him up as a most despicable character said of him, yet that character was to McCann so attractive that he sought his acquaintance and pledged him his friendship on first sight. One of the defenses was that McCann, concerning whose past life, character and

business there was evidence, had contracted enemies who had waylaid him. It is charged that the defendant murdered his best friend; if friendship is to be taken into account let us note that this was a frienship based on a diseased sentimentality.

Barrington accepted McCann's invitation, went to his hotel and became a sort of assistant manager of the business. On the evening of June 18, 1903, these two men left this house together, they went to the Suburban Garden, thence on the St. Charles electric railroad to a point in St. Louis county called Bonfils, where they left the car, and that is the last that was seen of McCann alive; the defendant returned to the hotel the next morning about 9 o'clock. When the dead body supposed to have been that of McCann was found, suspicion rested on the defendant and public interest in him was again aroused, the newspapers took up the subject and defendant's past life and character, as indicating a man capable of such a crime, became their theme and the overshadowing sensation for the time being. He was arrested, subjected to what the State's witness called "a course of sweating," and lodged in jail. During his preliminary examination, which took place at the court house at Clayton, the county seat of St. Louis county, a witness states that whenever the ruling of the examining magistrate on a question was in favor of the State the audience applauded. While he was in jail awaiting his trial the managers of one of the public theaters in St. Louis caused to be prepared for the stage a sensational drama to which was given the name "The Desperate Lord Barrington," and which dealt in a highly melodramatic style with the supposed life and character of the defendant, showing him in the most despicable light and professing to portray on the stage the murder for which the defendant was being held. When this drama was advertised, the defendant petitioned the court to have the parties who were purposing to put it on the

stage cited for contempt, but the court denied the petition and the play went on. After it had been enacted and the prejudicial effect which it was liable to have on the defendant's cause was shown to the court, the defendant again applied to the court to have it stopped, but the court again refused and the play went on. Afterwards the defendant moved the court for a change of venue on the ground of the prejudice of the inhabitants of St. Louis county, and at the hearing introduced the testimony of a large number of citizens of the county to sustain the charge of prejudice, he introduced also numerous articles published in the principal newspapers of the city calculated to create prejudice of the strongest kind against the defendant, and he introduced evidence of the character of the melodrama above mentioned enacted on the stage of the theatre. But the court denied the application for a change of venue.

Defendant filed a plea in abatement to the indictment on the ground that the State had failed to indorse the names of its witnesses on the indictment. There were twenty-nine witnesses examined by the State whose names were not indorsed on the indictment. The prosecuting attorney testified that to the best of his recollection he did indorse on the indictment the names of all the witnesses who appeared before the grand jury. The testimony for defendant on that point showed that eleven of these twenty-nine witnesses had been subpoenaed by the State in the preliminary examination, and three of them had testified before the coroner. The defendant asked the court to require the State to produce the subpoenas that had been issued for the witnesses to come before the grand jury, but the court refused. The plea in abatement was overruled.

During the trial the State was allowed over the defendant's objection to introduce testimony as to what the defendant was said to have said implicating himself

during the sweating process. The State was also allowed to cross-examine the defendant on matters concerning which he had not testified in chief.

The above is a very brief outline of the case but it is sufficient to present the points to which I would call attention.

I.  Section 2517, Revised Statutes 1899, requires the names of the State's material witnesses to be indorsed on the indictment. It is not for the courts to discuss the wisdom of the law; it is sufficient for us to know that it is the law and it is our duty to enforce it. It was made for the benefit of the accused, it is one of the rules prescribed by the Legislature to secure him a fair trial. It does not prohibit the State calling other witnesses who were unknown to the prosecuting officer when the indictment was presented, but it does mean that the State shall not purposely withhold the names of witnesses and surprise the defendant with them on the trial. It calls for good faith and fair dealing. The evidence tends to show that some of these witnesses were known to the State's attorney and what their evidence was. Besides, the court by refusing to order the production of the grand jury subpoenas deprived the defendant of the means of contradicting the evidence of the prosecuting attorney that the names of all the witnesses who were before the grand jury were indorsed on the indictment. But in view of the other more important features of this trial I regard the failure to indorse the names of the witnesses on the indictment as of comparatively small consequence; and especially since if a new trial should be granted the defendant, now knowing the names of these witnesses, cannot again be placed at disadvantage on that account.

II.  In the olden times to which I have already alluded when one suspected of a crime was arrested, he was put to the torture and broken piece by piece until the confession came; whether guilty or not guilty, the

confession usually came.   We have advanced many
milestones from that station, we no longer break them
on the wheel, we now only "sweat" them, and some of
these days we will advance beyond that station.  When
this man was arrested he was taken to the office of the
chief of detectives and from 9 o'clock in the evening
until 2 o'clock in the morning he was subjected to what
the witness for the State called "a course of sweat-
ing."

According to testimony in his behalf all the tech-
nical skill and ingenuity of the most experienced ex-
perts bore upon him to entrap him into saying some-
thing that would be evidence against himself.   There
was no threat, no promise, oh, no; in fact the prisoner
was expressly told that they would make no threat,
they would make no promise, he was entirely free to
answer or not as he might elect, yet free as he was,
the sweating process went on until at length his nerves
gave way, he broke down and wept.  What he said on
that occasion was given in evidence by the State, and
the court in its instruction to the jury on that point
said:  "What the defendant said against himself, if
anything, the law presumes to be true because said
against himself.  What he said for himself you are not
bound to believe because said in a statement or state-
ments proved by the State, but you may believe it or
disbelieve it as it is shown to be true or false by all
the evidence in the case."

I am not going now to contend that that testimony
was illegal because although we have advanced beyond
the rack and the wheel we still cling to the "sweating
process."   But I do contend that testimony so obtained
should not be given to the jury with the stamp of the
legal presumption of absolute truth upon it.   The jury
could not have understood the instruction to mean any-
thing else than that what the prisoner said that might
be construed as tending to incriminate himself, was to
be taken as Gospel truth, while what he said which

tends to exculpate him is to be received with caution and believed or disbelieved as the other evidence in the case might warrant. Not only does the court by that instruction invade the province of the jury who alone are entitled to weigh the evidence and determine the credibility of the witness, whether he be the party in interest or not, but it fails to distinguish between what all the law-writers on the subject call solemn admissions, that is, admissions *in judicio* or admissions *extra judicium,* which have been made to influence the conduct of others and therefore worked an estoppel, and mere verbal admissions. Those of the first class are presumed in law to be true (1 Greenleaf on Ev. (16 Ed.), sec. 27), while those of the second class should be received with caution. [Id., sec. 45.] And in section 200 the author says: "With respect to all *verbal admissions,* it may be observed that they ought to be *received with great caution.*"

In connection with the instruction above quoted I would call attention to instruction number 22 given by the court concerning the testimony of the defendant himself: "The defendant is a competent witness in his own behalf. The fact that he is the defendant and the interest he may have in the result of the case may be considered by you in determining the credibility of his testimony, but on the whole you should consider and weigh his testimony under the same rules as that of the other witnesses, as explained in the other instructions." If the jury were to weigh his testimony under the same rules as the testimony of the other witnesses was to be weighed, why single him out and caution the jury to bear in mind his interest and therefore (by implication) his strong temptation to testify falsely in his own behalf?

There is no authority in our statute for such an invasion of the jury's province. Section 2637, Rev. Stat. 1899, which gives a defendant, or the wife or husband of a defendant, the right to testify in his behalf, says

that the fact of the interest may be shown, that is, proven, for the purpose of affecting his or her credibility, but that does not authorize the court to single out the witness, whether it be the defendant or the defendant's husband or wife, and comment on his or her testimony; in fact section 2639 expressly forbids the court to comment on the evidence. I am aware that instructions of like character in other cases have been approved by this court, but I am not reconciled to them.

When the defendant was on the witness stand and had finished his testimony in chief, counsel for the State on cross-examination took up the subject of his past life and asked him questions about it, some of which he answered and some he refused to answer, and it is difficult to say whether the reluctant answers he gave or the refusals to answer made the more injurious impression on the jury; they were both calculated to seriously injure his defense. These were subjects not touched upon in his direct testimony and therefore the State had no right to examine him about them.

The questions related to some of the accusations contained in the newspaper statements shown in evidence on the motion for a change of venue, among which were the murder by defendant of an officer in the British Army, his marriage under the name of Burton to a woman in New York, his marriage under the name of Lord Barrington to a woman in St. Louis, his sentence to the Work House in St. Louis and other matters designed to hold him up before the jury as a man well worthy of death even if he was not guilty of the murder for which he was being tried. The court seems to have admitted this evidence on the theory that it bore on the question of the credibility of the witness. The statute which allows a defendant to testify in his own behalf and expressly limits the right of cross-examination to matter referred to in his examination in chief says: "He may be contradicted and impeached

as any other witness in the case." [Sec. 2637.] The fair construction of that clause is that he may be contradicted, and that testimony showing his general reputation in the community for truth may be given. If it means that for purposes of impeachment he may be examined on every subject that has ever come into his life for the purpose of degrading him, then the words of the statute which limit the subjects on which he may be cross-examined may as well be stricken out; if the statute allows a cross-examination like this, there is no limit to the cross-examination to which he may be subjected.

It is said in the brief for the State that this point was not properly brought to the attention of the court in the motion for a new trial. That is so, if the general statement that the court admitted illegal evidence is not sufficient. But when a man"s life is at stake, is this court going to overlook so grave an error as this for so small a technicality? The counsel for the prisoner and the prisoner himself pressed their objections to the question to the very verge of flat refusal to answer after the court had ordered him to do so and provoked the court into reprimanding the prisoner in the presence of the jury for such refusal, and drew from the prosecuting attorney this damaging remark: "If he wants to avail himself of his constitutional privilege for fear of incriminating himself, that is a constitutional privilege." To which remark when objection was made the court ruled as follows: "You gentlemen don't refrain from making remarks on either side. You should not do so," which, if a rebuke at all, was as much a rebuke to the defendant's attorney as it was to the State's attorney who had made the objectionable remark. That course of cross-examination should never have been allowed; even if no objection had been made to it, the court who sits to administer justice should have protected the prisoner from such wrongful procedure.

I come now to a consideration of what I consider

the gravest error in the case; that is, the refusal of the court to grant a change of venue.

It will be impossible in the space which I am willing to take in this opinion to give anything like a detailed summary of the evidence that was presented to the court in support of this application. A large number of respectable witnesses of St. Louis county testified that there was a prejudice in the minds of the people of that county against the defendant; but the strongest evidence was the production of the newspapers which circulated in the county and which moulded public opinion. Every strong influential newspaper in the city published, day after day, columns of the most damaging statements concerning the man. These professed to have discovered and brought to light events in his past history connecting him with the most atrocious crimes in Europe before he came to America, and the despoiling of at least two young women under fictitious marriages in this country; then they took up what was said to be the evidence in this cause, and showed the defendant in the light of the cruel murderer of his best friend; there could be, according to the newspapers, no doubt of his guilt. To such a high point in the public mind was the subject brought that the managers of one of the prominent theatres in the city caused a most thrilling melodrama entitled "The Desperate Lord Barrington" to be prepared and put upon the stage in which this defendant was the chief villain and McCann his latest victim. The play was advertised in all the prominent newspapers and in flaming posters. In the posters it was described as the "Acme of Sensational Melodrama. A play filled with thrills, throbs, laughter and tears. It quickens the pulse beats, excites emotions and stirs the better nature of every auditor. A play in which virtue wins and the villains get all that is coming to them." The chief actor in the play was, in theatrical parlance, "made up" to look like the defendant, and

imitated his voice and manner. According to the play the defendant was guilty of murdering the real Lord Barrington before he came to America, and besides marrying several women, committed another murder in this country before he landed in St. Louis. The scene of the climax of the drama was made to represent the rock quarry near Bonfils in St. Louis county where the dead body was found, and there the defendant and Mc- Cann appeared.

It is eight miles from the court house in St. Louis to the court house at Clayton. Clayton is a close suburb to the city of St. Louis, two lines of street cars connect it with the city. The inhabitants of St. Louis county are so intimately connected with the city in vicinage, in social and business relations, that it is impossible for them to be uninfluenced by that which influences to a high degree the inhabitants of the city.

In matters of the kind we are now considering the newspapers, especially when they are all agreed, mould public opinion. When these newspapers with their exciting reports of alleged discoveries of inculpating evidence, and the character of this extraordinary theatre performance were laid before the court on the motion for a change of venue, there was no necessity to call witnesses to testify that there was a prejudice in the minds of the people of St. Louis county against this man. No case has ever come under my notice where the evidence on this subject was so overwhelming. The inhabitants of the county, if they possessed that abhorrence to crime that is felt in all enlightened·communities, could not, when subjected to these influences, have failed to have conceived a strong prejudice against this defendant.

It is said in the brief for the State that the application for the change of venue was not supported by the affidavit of two credible disinterested witnesses of the county as required by section 2576, Revised Statutes 1899. It appears that the application was supported by

the affidavit of two witnesses; just what the particular objection to them is does not quite appear, but I consider that immaterial at this stage of the case. The court might have refused to receive the application or hear evidence in support of it if it was not fortified as the statute requires, but after receiving the application and hearing the evidence pro and con, the court could not deny the petition because of such a trivial technical defect, if the testimony showed that the change ought to have been granted. No court would stick in the bark in such a matter.

It is also said that the application for the change of venue was addressed to the discretion of the trial judge, and he having exercised his discretion it ends the case. It is a discretion to be exercised, but it is a judicial discretion, not a personal one, and it is subject to review. The trial judge had the witnesses before him, was perhaps acquainted with many of them, and therefore better able to judge of the weight to be given to their testimony. But the oral testimony on both sides was mere opinions; the court had before it the facts which make public opinion, and with those facts in view the opinions of no number of witnesses could make it appear that this much-advertised and dramatized man could have a fair trial in that community.

Lastly it is said that the St. Louis newspapers circulate throughout the State and the probabilities are that their influence would be felt in whatever county the case might go. Possibly that may be true to some degree, but it is not likely to be true to the same degree, and at all events the law has given the defendant the right to the change; he only asks what the law gives him, and we have no right to deny him by saying it will do him no good to grant his prayer. The evidence shows that he is entitled to a change of venue and if the court fears that the prejudice has gone beyond the lines of that county, it would send the case where the preju-

dice is least likely to exist, or at least to the least extent.

There is one other incident of this trial that I will mention.

Counsel when arguing a case before the jury ought to represent their client, and reflect their client's mind. The State of Missouri is not vindictive; when it arraigns a man before the bar of justice to answer a charge that involves his very life, it does so with the dignity and solemnity of a sovereign and without passion. Counsel intrusted to speak for the State should speak with dignity, solemnity and without passion, otherwise they do not represent the State. At this trial counsel intrusted with the duty of representing the State in his argument before the jury said: "In all candor and with due reverence, I wish to confess to you that during the progress of this trial, my conception of the devil has been materially changed. And if I were to portray him to you now, I would not paint him as hoofed and horned, lurid with purgatorial fires, but rather would I picture him to you as arrayed in white vest and Prince Albert coat, with a voice as soft as the breath of summer and with a steel gray eye." And while so saying he pointed with his hand across the counsel table to the defendant who sat there wearing a white vest and a Prince Albert coat, whereupon the court said to the counsel: "That is not proper argument." It was not proper argument, it was no argument at all, it was a vindictive, passionate, pitiless, cruel denunciation of a prisoner. No one defends it, it is indefensible. But it is contended that the gentle rebuke cured the wrong that was done. How can we who are weighing in the judicial scales the life of a fellow man say that although this was a flagrant wrong yet the wrong was cured? Can we enter into the minds of the jury to see what the effect of the so-called rebuke was? The words of denunciation came with hot zeal and were calculated to burn themselves into the memories of the jury. And we cannot dispose of the subject by saying the court rebuked

the counsel — what more could it do? If the court can do nothing more when a wrong like this has been done in a case of life and death than to say to the counsel, "that is not proper," then the court has but little power to direct the course of justice, and counsel are free to indulge in such abuse if they are so inclined. But there is a power intrusted to the trial court to right such a wrong. The court in such case has the power to set aside the verdict and grant a new trial, that is the only real remedy for such wrong and that is what it should have done in this case.

The probable cost should not influence the selection of a forum; when we put human life in one side of the scales we should not put dollars in the other side. But even from an economical point of view it is bad policy.

A large part of the enormous sums paid by the State every year for costs in criminal cases would be saved and as many criminals would be convicted if the laws of criminal procedure enacted by the Legislature to secure to every man a fair trial were more carefully observed. Guilty men can be convicted in a fair trial as easily as in an unfair one, and when they have been fairly tried their conviction will stand and the State will not be put to the expense of a second or third trial.

There are other points in the case, but I will not discuss them because this opinion is already very much longer than I intended it should be when I began to write. In my opinion the judgment ought to be reversed and the cause remanded with directions to the circuit court to grant the application for a change of venue.

*Graves, J.,* concurs in three points of this opinion, viz.: that the judgment should be reversed and the cause remanded, first, for the refusal to grant the change of venue; second, for the improper cross-examination of the defendant; third, for the improper remarks of the attorney for the State.